UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 20 CR 637 |
| v. | |
| JEREMIAH HARRIS | Judge Manish S. Shah |

**GOVERNMENT'S POSITION PAPER AS TO THE PRE-SENTENCE
INVESTIGATION REPORT AND SENTENCING FACTORS**

The UNITED STATES OF AMERICA, by JOHN R. LAUSCH, JR., United

States Attorney for the Northern District of Illinois, submits its Position Paper as to

the Pre-Sentence Investigation Report and Sentencing Factors in the above-captioned

matter. For the reasons set forth below, the government respectfully requests that

this Court sentence defendant Jeremiah Harris to a term of imprisonment of 15 years,

followed by ten years of supervised release, a below-Guidelines sentence well-

supported by the factors to be considered under Title 18, United States Code, Section

3553(a).

I.     **BACKGROUND**

Like many child predators, Jeremiah Harris took advantage of a power

imbalance to sexually exploit his young victims. He preyed on the insecurity and

youth of boys in the cheerleading community to abuse them. Harris was persistent in

attempts to induce victims to produce and send him child pornography, and to meet

him to engage in sex acts at cheer events. In mitigation, Harris's childhood included

periods of poverty and homelessness; he was young at the time he committed these

horrific offenses; and due to his childhood full of setbacks and developmental delays,

he was far less mature than his age at the time of the offenses. Balancing the aggravation and mitigation in analyzing the factors set forth in 18 U.S.C. § 3553(a), a below-Guidelines sentence of 15 years' imprisonment, followed by 10 years of supervised release, is sufficient but not greater than necessary to achieve the purposes of sentencing.

### A.  Background of the Investigation

Child sex predators always look for some method to exploit their victims. Jeremiah Harris used what he had at his disposal - his status as a competitive cheerleader, his social media persona, and eventually his celebrity and money, to persuade and entice his young victims to engage in sexually explicit conduct for him or with him.[1] He preyed on young, adolescent, vulnerable boys. Most of his victims participated in cheerleading and were looking for acceptance and belonging in the cheerleading community where Harris was a competitor, a coach, and a leader. His victims looked up to him as someone who had accomplished what they wished to accomplish in the sport of cheerleading. Harris leveraged his influence over his victims through use of his social media accounts, where he portrayed himself as not just an elite athlete in the sport, but as a supportive and encouraging personality and a mentor who could be trusted, an image later buttressed by his television series persona. His victims believed him. But Harris was not what he appeared to be.

---

[1] Information in this section and throughout this memorandum is based on Probation's Presentence Investigation Report ("PSR") and the Sentencing Recommendation, the Government's Version appended to the PSR, the Defendant's Version, and materials previously provided to the defense.

Beneath the veneer of positivity and friendship was someone who exploited them and their vulnerability for his own sexual gratification.

From August 2017 to August 2020, Harris used his social media accounts to repeatedly induce his victims to send him pornographic photos and videos, sometimes continuously, over the course of months and years. Harris pressured his victims, he guilted them, he paid them and, when those things failed, he threatened to disseminate the videos they had sent if they refused to continue. Harris's online conversations were also attempts to groom his victims for hands-on offenses. He pressured them to meet with him in person and to engage in sex acts with him at cheerleading competitions and events. And, at one such event, Harris sexually assaulted one of his victims.

Eventually, the mother of one of Harris's victims reported Harris to authorities within the sport, and then to law enforcement. In September 2020, FBI agents executed a search warrant at Harris's residence and interviewed Harris. Harris immediately admitted to sexually exploiting multiple children and cooperated with agents in identifying all of his victims. As a result of the federal investigation, on December 10, 2020, Harris was charged with seven counts of production and receipt of child pornography and enticing children to engage in sex acts. Harris did not stop sexually exploiting children until he was taken into federal custody. On February 10, 2020, Harris pled guilty to one count of receipt of child pornography and one count of interstate travel to engage in a sex act with a minor, and admitted the other counts as stipulated offenses.

**B.      Harris's Conduct with the Victims.**

1.      Timeline of Charged Conduct

From the inception of his contact with each of his victims, Harris repeatedly and persistently pressured them to send him sexually explicit photos and videos of themselves. Harris's first charged offense began in the summer of 2017, when Harris reached out to Minor 5 via Snapchat. Minor 5 was 13 years old. The following year, in 2018, Harris attempted to meet with Minor 5 in person at a cheerleading competition in Dallas, Texas.

By the end of the next year, in December 2018, Harris had contacted Minor 1 via Instagram. Minor 1 was 13 years old at the time. A couple months later, in February 2019, Harris contacted Minor 4, also via Instagram. Minor 4 was 15 years old at the time. In February 2019, Harris attended a cheerleading competition in Fort Worth, Texas, where he induced Minor 1 to meet with him. Minor 1 was 13 years old at the time. During that meeting, Harris attempted to induce Minor 1 to perform oral sex on him in a public restroom. A month later, in March 2019, Harris attempted to meet with Minor 4 at a cheerleading competition in Dallas, Texas, though Minor 4 declined. In the last week of April 2019, Harris persuaded Minor 4, successfully this time, to meet with him in person at a cheerleading competition in Orlando, Florida. Harris's actions at that meeting made Minor 4 so uncomfortable that by May he ceased communicating with Harris.

A week later, in May 2019, Harris returned to Orlando, Florida, and attended a different cheerleading competition, where Harris did not compete. Instead, at that

competition, with thousands of people present, Harris persisted in trying to induce Minor 5 to meet with him in person. This time, Harris, who was a 19-year-old adult at the time,[2] succeeded and convinced Minor 5, a 15-year-old child, to meet him in a public restroom, where Harris anally raped the child. But the rape of Minor 5 that weekend was not enough to satiate Harris's sexual desire. At that same competition, Harris also attempted to meet with Minor 1 and Minor 4 to engage in sexual conduct. Around that same time, Minor 4 ceased communication with Harris.

For the next several months, however, Harris continued to induce Minors 1 and 5 to engage in sexually explicit conduct, record it, and send the photos and videos to Harris. In January 2020, the Cheer docuseries aired on Netflix. Cheer was a hit, and Harris became famous for his cheerleading and his charismatic, outgoing persona.

In May 2020, Harris was notified by cheerleading authorities that he was under investigation for his sexual misconduct. Knowing that he had done wrong and not wanting to be caught, Harris destroyed his phone and his messages with Minor 1 and the others. Demonstrating the dangerousness of Harris and his inability to control his criminal and sadistic behavior, after a few months passed without contact from law enforcement, Harris bought a new phone and continued his course of sexual exploitation. A month later, in June 2020, Harris met Minor 2 at a house party. Soon after that, Harris reached out to Minor 2 via social media, and for the next several

---

[2] Harris was born in July 2019. In May 2019, he was about two months away from attaining 20 years of age.

months, Harris used his wealth to induce Minor 2 to send him a continuous supply of sexually explicit photos, videos, and video calls, of both Minor 2 and Minor 3. This continued until he was arrested and taken into federal custody on September 17, 2020.

### 2. Harris's Exploitation of the Five Minor Victims

#### a. Minor 1

In December 2018, Harris reached out via Instagram to Minor 1, a 13-year-old aspiring cheerleader who posted cheerleading content to his own Instagram account. Harris immediately asked Minor 1 how old he was. When Minor 1 responded that he was 13, Harris replied, "have any pics?" Minor 1, not comprehending, asked, "what type of pics," and Harris responded, "face picd [sic] and booty":



For the next year and a half, Harris repeatedly requested that Minor 1 engage in sexually explicit conduct, record it, and send it to Harris for his personal consumption. Minor 1 complied, sending images of his penis and buttocks at least monthly. Harris gave Minor 1 explicit, specific instructions of what to do in the photos. For example, when Minor 1 posted the below picture of himself performing a challenging cheerleading maneuver called the "needle" to his own social media account, Harris messaged Minor 1 at his account, "do it naked take a video and show me":



Harris also attempted to lure Minor 1's brother to send him lewd photos. Although Minor 1's brother did not comply, he stated that Harris would become "pushy" and put him on guilt trips when he refused.

In return for the sexually explicit photos, Harris engaged with Minor 1 and called himself a friend. In the picture set forth below, Harris posed for a photograph with Minor 1 in February 2019.



In addition to soliciting explicit photos, Harris solicited in-person sex acts from Minor 1 and Minor 1's brother. Below is a photo of a Snapchat message that Harris sent to Minor 1's brother, asking if he wanted to "****," which Minor 1's brother understood to mean as "fuck." Harris confirmed in an interview with law enforcement that he did in fact mean "fuck" when he sent this message to Minor 2.



Harris also attempted to persuade Minor 1 to engage in sex acts on at least two occasions. The first attempt occurred at a cheerleading competition in February 2019, only three months after Harris and Minor 1 had met. At the time, Minor 1 was a 13-year-old child and Harris was a 19-year-old adult. Harris followed Minor 1 into a bathroom, where he tried to convince Minor 1 to perform oral sex on him. Harris pressured Minor 1 for long enough that Minor 1's brother noticed his absence and texted him to return for the team's warm-ups. Minor 1 refused Harris and hurried out of the bathroom back to his team. Three months later, in May 2019, Harris tried again to get Minor 1 alone at another cheer competition. In the days leading up to the event, Harris messaged Minor 1 that he had "found a place for us to do stuff":



Harris's conversations with Minor 1 show that he knew what he was doing was wrong. For example, in February 2020, Harris (whose messages appear in black) told Minor 1 (whose messages appear in blue) that they should no longer communicate on Snapchat, explaining that he was "sorry" for what he had "done in the past":



Harris's message demonstrates that Harris fully understood that what he was doing was wrong and harmful to Minor 1, at the time he was doing it.

Minor 1's response demonstrates why predators like Harris prey on children. Not able to comprehend that he was being exploited by Harris, and not wanting to lose the attention of someone he looked up to, Minor 1 protested, and tried to salvage what he had been led to believe was a genuine friendship. During the following exchange, Harris's child victim assured the adult that he (Harris) had not done

anything wrong, begged Harris to remain friends, and pleaded with Harris not to be mad at himself:



Harris's decision to cut ties with Minor 1 did not last. Harris re-engaged with Minor 1. For example, in April 2020, Harris sent Minor 1 an "inspirational video" at Minor 1's request. Minor 1 had asked Harris for a video that he (Minor 1) could send to one of his friends in the cheerleading community. In exchange for this video, Harris

required Minor 1 to continue sending Harris sexually explicit photos of himself for Harris's personal consumption.

In May 2020, after Harris was notified that he was being investigated for this conduct, Harris destroyed his cell phone and his messages with his victims. But even under threat of exposure, Harris was unable to control himself and soon re-engaged Minor 1 and others with a new phone.

### b.     Minor 4

In February 2019, Minor 4 was a 15-year-old cheerleader who followed Harris on Instagram. Harris contacted Minor 4 over Instagram and learned that Minor 4 was 15 and a sophomore in high school. From about February to May 2019, during the time Harris was filming the Cheer series and soliciting child pornography from Minors 1 and 5, Harris persistently requested sexually explicit photos from Minor 4. Harris told Minor 4 that he was "horny" and asked for photos of Minor 4's penis and butt. Harris induced Minor 4 to send him videos of himself masturbating, and gave Minor 4 specific instructions, such as to go faster or slower or to insert things into his anus. Harris also sent pictures of his own penis and videos of himself masturbating to Minor 4 during these encounters. Minor 4 described Harris as "pushy."

As with his other victims, Harris also repeatedly attempted to persuade Minor 4 to meet with him in person. Harris asked Minor 4 to meet with him at a March 2019 competition. Minor 4 declined, but Harris persisted, and convinced Minor 4 to meet with him at a competition the last week in April 2019. At the April 2019 competition, Harris hugged Minor 4 and told him, "I love you so much, baby." Harris attempted to

13

meet with Minor 4 again about a week later, at a May 2019 competition the following weekend (the same competition where Harris raped Minor 5 and also attempted to meet with Minor 1), but Minor 4 declined. Although Minor 4 did not engage in any in-person sex acts with Harris, Harris's conduct at the April 2019 competition made Minor 4 feel so uncomfortable that Minor 4 ceased communications with Harris shortly thereafter.

### c.     Minor 5

In the summer of 2017, Minor 5 was a 13-year-old boy involved in competitive cheerleading. Harris reached out to Minor 5 via Snapchat and, as with other victims, Harris asked Minor 5 to send him sexually explicit photos of himself almost immediately after reaching out. After Minor 5 complied by sending Harris a nude photo, Harris threatened to share the photo publicly if Minor 5 did not send another. Believing he had no choice but to comply, Minor 5 continued to send sexually explicit photos of himself, in response to Harris's relentless requests. Minor 5 recalls being directed to "bend over" so that Harris could get a better view of his "hole." Harris also induced Minor 5 to send him videos of himself masturbating, beginning at age 13. Minor 5 recalls Harris directing him to bend over in one video. And, as with Minor 4, Harris also sent Minor 5 photos and videos of himself masturbating.

Harris also repeatedly attempted to meet with Minor 5 in person at cheerleading events. Prior to a March 2019 competition, Harris messaged Minor 5, who was 14 years old at the time, that he wanted to meet and had found a spot to hang out. Minor 5 believed that Harris wanted to have sex and did not meet with

14

Harris at that time. Despite this, Harris persisted in his attempts to meet with Minor 5. In the weeks leading up to the May 2019 competition, Harris began texting Minor 5 about meeting in person. This time, Minor 5 agreed, in the naïve hope a kiss would be enough to get Harris "off [his] back."

Harris met with Minor 5 in a stall in a public restroom at a televised event, attended by thousands of people. While people came and went, Harris sexually assaulted Minor 5. Harris began by kissing Minor 5, but then took it further, removed Minor 5's pants, and performed oral sex on Minor 5. Harris then wanted Minor 5 to perform oral sex on him. When Minor 5 said no, Harris, a large 20-year-old man, turned around Minor 5, a slight 15-year-old boy, whom Harris had been grooming for years, and penetrated him anally until Harris was satisfied. Harris did not use protection. Afterward, Harris told Minor 5 that he should have "cleaned out" to be ready for anal sex. Minor 5 told Harris that he had not expected that to happen. Minor 5 later said of the assault, "I felt like I couldn't do anything about it. I felt like I could not move. It hurt and it did not feel good."

### d.    Minors 2 and 3

Harris first met Minor 2 at a party in June 2020 and later reached out to Minor 2 through Snapchat. As with Minor 1, Harris asked Minor 2 how old he was, and Minor 2 told Harris that he was 17. Minor 2 and his friend, Minor 3, also 17 years old, recognized that Harris's Snapchat account was "verified," reflecting his public status. In their first conversation, Minor 2 refused Harris's request to see his "butt," and Harris unfriended him for a short time and then added him back and tried again.

15

When he was unable to get Minor 2 to send him sexually explicit photos, Harris used the new tool at his disposal—wealth. Over the course of the next several months, in response to Harris's requests and in exchange for a total of approximately $1,700 in payments, Minor 3 took sexually explicit photographs of himself, which Minor 2 sent to Harris.[3] Harris requested specific images, including pictures of Minor 2's "butthole," "bending over," and "mirror" images, as well as images of his penis, both erect and flaccid. Harris sometimes asked Minor 2 to retake the images to his specifications, which he did.

During the same period of time, Harris paid Minor 2 $500 to participate in a video call during which Minor 2 followed Harris's instructions to show his naked body from the chest down, including his butt, while Harris masturbated. And, just as with his other victims, Harris attempted (unsuccessfully in this case) to persuade Minor 2 to meet him in person, at one point offering him $2,000 to meet in person and sit on Harris's face. In one phone conversation, Harris told Minor 2 that he was afraid someone would find out about their sexually explicit communications. Not satisfied with Minor 2's assurance that he would not report Harris, he demanded that Minor 2 swear on his mother not to tell anyone about what he was doing to him.

## II.   THE GOVERNMENT AGREES WITH THE PSR'S PRELIMINARY GUIDELINES CALCULATIONS.

The government agrees with the Guidelines calculations set forth in the Presentence Investigation Report. PSR ¶ 212. Based on a total offense level of 43 and

---

[3] It is unknown whether Harris knew that Minor 2 was sending him images of Minor 3.

a criminal history category of I, the Guidelines Range is life. Pursuant to Guideline § 5G1.1(a), because the statutorily authorized maximum sentence of 50 years is less than the applicable guideline range, 50 years is the guideline sentence. Defendant is also subject to a mandatory minimum sentence of 5 years for his conviction under Section 2422(b).

### III. THE SECTION 3553(A) FACTORS WARRANT A SENTENCE OF 15 YEARS' IMPRISONMENT

The Sentencing Guidelines provide a starting point and initial benchmark for sentencing. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The "Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country." *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005); see also *United States v. Pulley*, 601 F.3d 660, 668 (7th Cir. 2010) (a "district court that sentences within the Guidelines necessarily gives weight and consideration to avoiding unwarranted disparities."). Although a sentence within the Guidelines is presumptively reasonable, *United States v. Cano-Rodriguez*, 552 F.3d 637, 639 (7th Cir. 2009), the court must consider the factors set forth in 18 U.S.C. § 3553(a), in determining an appropriate sentence. Here, the factors set forth at Section 3553 support a below-Guidelines sentence of 15 years' imprisonment.

### A. Nature and Circumstances of the Offense

#### 1. Harris abused a position of authority and influence.

Harris preyed on vulnerable children for years. Harris's status in the sport of cheerleading put him in frequent contact with countless young boys who looked up to him and wanted to follow in his footsteps. Harris used his status and his social media

17

accounts to engage young boys, knowing he could manipulate and intimidate them into doing his depraved bidding. In public, Harris held himself out as a friend and mentor and a paragon of sportsmanship. Behind closed doors, however, Harris sexualized and objectified the teenage boys he enthralled. Outside the view of his audience, and unbeknownst to the many friends and family members who have written letters in support of Harris's character, Harris pressured the children who looked up to him to engage in sexually explicit acts, record them, and send the recordings to Harris for his private consumption. As he rose to fame and fortune, Harris used his celebrity and wealth to continue his exploitation of children, expanding the tools available to him to manipulate them into gratifying his seemingly insatiable sexual desires.

Harris insists that he did not exploit his celebrity status, because much of the offense conduct occurred before the Netflix series aired. While the Netflix series did bring him a wider measure of fame, Harris had become a respected and influential figure in his sport well before that television show aired. Harris was an older, more experienced athlete on illustrious, elite competitive teams, with a social media following, and a coach to younger, less experienced athletes. The February 2019 photograph of Minor 1 posing with Harris at a cheerleading competition shows that, long before the docuseries aired, Minor 1 recognized Harris as having success and influence in the sport.

When the Netflix docuseries aired, it only broadened Harris's influence and appeal and strengthened his ability to manipulate his victims. Even victims like

Minors 2 and 3, who were not cheerleaders, recognized that he had the verified account and the following of a public persona, whose attention was presumptively worth having. And when Harris could not persuade Minor 2 to send him a sexually explicit photo, Harris offered to and did pay Minor 2 thousands of dollars to do what he wanted. Certainly, this particular form of influence, which allowed him to victimize Minors 2 and 3, was a direct result of Harris's newfound celebrity status.

**2. Harris pressured victims to continue complying with his demands over extended periods of time.**

Harris's offenses were not a one-time lapse in judgment. After leveraging his status and his persona to lure them in, Harris used his social skills and adeptness to manipulate and intimidate his victims to continue complying with his requests. His requests and demands were persistent and relentless. Minor 1's brother and Minor 4 both described Harris as "pushy," and as making them feel guilty when they did not comply. Harris made Minor 2 swear on his mother that he wouldn't tell anyone what Harris was doing to him. Harris threatened to post the sexually explicit images that Minor 5 sent him publicly. Harris also intimidated his victims by sending them unsolicited sexually explicit photos and videos of himself and masturbating on video calls with them.

Further, Harris's persistent manipulation was not only meant to induce them to produce child pornography; it was also part of a continuous effort to groom his victims to commit hands-on offenses. Harris repeatedly asked Minors 1, 4 and 5 to meet with him at cheerleading competitions until he was stopped by law enforcement. Minor 5, with whom Harris communicated with for years, initially refused and

resisted Harris's pressure, but explained that he finally relented in the hope that a kiss would get Harris "off his back." This was cynical, manipulative and depraved conduct.

### 3. Harris's misconduct has profoundly impacted his victims.

There is no question that Harris's misconduct took something away from each of his victims. The impact cannot be overstated and will affect them for years to come. Minor 1's mother described watching her sons' behavior change while Harris manipulated them unbeknownst to her.[4] Without understanding why, she watched Minor 1 become anxious, unable to sleep, unable to focus, and experience panic attacks, while his grades suffered. Minor 2 stated that he ultimately came forward in support of other victims who had been disparaged after coming forward. Minor 3 stated that Harris's misconduct made him feel self-conscious, used, uncomfortable, and regretful.

Harris's attempts to solicit in-person sex acts also had a profound impact on Minor 1's health and well-being. At the time Harris solicited oral sex from Minor 1, Minor 1 was a 13-year-old boy being pressured by a 19-year-old adult. Harris continued to pressure Minor 1 from age 13 to 14. According to his mother, Minor 1 became afraid of public restrooms, to the extent that he is unable to use them and would plead for permission to come home from school due to panic attacks. For years, to avoid the necessity of entering a public restroom Minor 1 avoided eating, and now,

---

[4] At this time, the government has received and has submitted one victim impact statement, from Minor 1's mother. The government will supplement with additional statements as they are received.

at age 16, is 2 inches shorter than his identical twin brother. This is one of undoubtedly many consequences that will play out in his victims' lives, that define the seriousness of his conduct.

## B. Defendant's History and Characteristics

As set forth below, Harris's history and characteristics are mitigating, and led the government to conclude that while a significant sentence is warranted, a below-Guidelines sentence of 15 years' imprisonment is appropriate and sufficient to advance the goals of sentencing.

### 1. Harris's difficulties in early childhood.

Harris's childhood was traumatic. Harris's early childhood was spent in poverty, in a single parent household, enduring periods of homelessness. Harris was ostracized throughout his youth for his weight and sexual orientation. And the defendant presents a report by a forensic psychologist who opines that these and other adverse events in Harris's early childhood development stunted his psychological and psychosexual development. The government also expects to discuss in detail at the sentencing hearing additional significant mitigating factors related to defendant's past experiences and his mental health,[5] which contribute to the government's request for a below-guidelines sentence in this case.

However, while Harris's childhood was very difficult, it was not a blank check to commit sex offenses against minors. And his circumstances improved as he got

---

[5] These factors are referenced at pages 6-7 of the Defense Version, in the psychological evaluations attached to the Defense Version, and in the PSR at paragraphs 64, 166-68, and 172-74.

older. By high school, Harris was adopted by a responsible, caring family in an affluent Chicago suburb, to whom he appears to be very strongly bonded. For the past several years at least, he has had the benefit of stable and supportive attachments with his adoptive parents in the cheerleading community, as well as positive social relationships. He has received the educational and emotional support that he needs. And it has had a positive impact. In 2016, teachers described Harris as receiving good grades, and being on-task, well-liked, and popular in class. Indeed, since his early childhood, Harris has experienced a significant amount of success in his life, more than many who start under similar circumstances. Harris graduated from high school, went to college and made it to the top of the sport he loved. And, while Harris was younger than many sexual predators, he was not a child. He was an adult. At the time that he raped Minor 5, a 15-year-old, Harris was 4 to 5 years older than his victim – two months away from 20 years of age.

Harris's functioning in the classroom, among other things, demonstrates that he is extremely socially adept, and therefore fully capable of forming positive, functional relationships with individuals his own age. Harris chose instead to use his social skills to lure and induce children to engage in and record sexually explicit activity, and to keep doing so even though it made them uncomfortable. While the Court should not ignore the impact of his childhood, it must also acknowledge the remarkable opportunities that Harris has had since then to develop into an adult, responsible for his own choices.

### 2. Harris's risk of recidivism.

Likewise, evidence weighs on both sides of Harris's risk of recidivism. The defendant presents a report by a forensic psychologist who concludes that Harris is overall at a low risk of recidivism. This opinion is based on four separate methodological assessments. One of these assessment tools reflected an "above average" risk level, and one reflected a "medium score pertaining to general risk [of] recidivism." Dr. McGarrahan cites as factors increasing Harris's risk, among other things, his young age (he is 22), his childhood experiences, his access and exposure to potential male victims, and the "presence of both a non-contact sexual allegation as well as a contact sexual allegation." These are not mere allegations, but offenses that Harris admitted to in the plea agreement.

The report also lists several factors that may mitigate the risk of recidivism ("protective factors"). The report notes such as that Harris exhibits a "prosocial disposition," and does not meet diagnostic criteria for pedophilia or paraphilia, or personality disorders. Likewise, Harris submitted voluminous letters and statements from friends and family members in the cheerleading community. Harris's positive relationships are supportive of his ability to be rehabilitated. These factors, however, were all true of Harris during the approximately three years that he was committing the offense conduct.

Further, in February 2020, not long before his forensic psychological examinations in this case, Harris, likely becoming more wary in response to the enormous amount of media attention he was receiving, ceased communications with

Minor 1 temporarily, saying, "I'm sorry for what I've done in the past." This undercuts the argument that Harris believed his conduct to be normal or acceptable. To the contrary, Harris knew that what he was doing was wrong, not consensual, and harmful to his victims, at the time he was doing it. He did not need to be told that. Nevertheless, he did not stop. When he learned he was being investigated, Harris destroyed his phone and deleted his messages from his social media accounts. Clearly, Harris also understood that his conduct was criminal, and against his own interests as well. Still, Harris did not stop. After very little time passed without consequences, he re-engaged with his minor victims.

Thus, Harris's recidivism risk, as played out in the real world, is inconsistent with the prognostications of the defendant's experts. Harris's conduct was driven by a need that was stronger than these "protective factors," indeed stronger than his own conscience or self-interest. What this conduct demonstrates is the critical importance of swift and strong consequences in a case like this. The defendant cannot be trusted to stop himself. The Court's sentence must be sufficient to supply a real and lasting impression of the consequences of failing to do so. A sentence of 15 years' imprisonment is sufficient but not greater than necessary to do that.

## C. The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Protect the Public, and Provide Adequate Deterrence

Children are the most vulnerable members of our community. Their vulnerability and innocence make them defenseless to predators like Harris. Sexualizing children in the manner that Harris did deprives them of their childhood and visits trauma on them, their families and friends, that will continue to impact

them long after the experience is over, quite possibly long after Harris is released from prison. A sentence of 15 years' imprisonment protects children and protects our communities by sending a strong, clear message that sex offenses against children are not a gray area.

Production and receipt of child pornography, specifically, are extraordinarily serious offenses that threaten the safety of our children and our communities. Congress and the courts have repeatedly recognized the destructive impact that the production of child pornography has on the victim: "Congress finds that-… where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years." S. Rep. No. 104-358, 1996 WL 506545, § 2(2) (Aug. 27, 1996).

Unlike some child predators, Harris is not known to have disseminated any of the child pornography that he produced. For this reason, among others, the United States recommends a below-Guidelines sentence in this case. But Harris's production and receipt of pornography were the more dangerous, and the more traumatic to his victims, because they involved an abuse of trust and authority, and because they were part of a continuous effort to groom his victims for even more serious hands-on offenses, ultimately leading to the rape of Minor 1. Minor 1's trouble in school and his fear of public restrooms is one vivid example of the horrible impact has actions have had and will continue to have. A sentence of 15 years' imprisonment reflects the

seriousness of the offense in this case, its impact to Harris's victims, and protects the public from future crimes by defendant.

Moreover, general deterrence is also imperative in this case. Harris's offenses occurred within the context of the "Cheer" community – the same community that Harris describes as "adopting" him, and that has submitted voluminous letters and statements in support of Harris's character. While his positive relationships are certainly mitigating factors that speak to his potential to be rehabilitated, the Court's sentence must also speak clearly to the community and the culture that was one of the instruments Harris used to exploit these children.

## IV. GOVERNMENT'S PROPOSED TERMS OF SUPERVISED RELEASE

The government agrees with the recommendation of the Probation department for ten years of supervised release. While the mitigating factors in this case justify a below-Guidelines sentence, the nature and circumstances of this offense and defendant's conduct require this lengthy period of supervised release. Defendant's conduct persisted over several years, despite his success, despite the threat of exposure from national media attention and despite his knowledge of a pending investigation. Moreover, defendant is 22 years old and will still be a relatively young man when he is released from prison. A ten-year period of supervised release is necessary to ensure the continued safety of the community and will afford defendant the opportunity to engage with the treatment services that he needs to be rehabilitated and re-integrated into society.

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose a sentence of 15 years' imprisonment and ten years of supervised release.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: */s/ Kelly L. Guzman*
KELLY L. GUZMAN
Assistant United States Attorney
219 S. Dearborn Street, Rm. 500
Chicago, Illinois 60604
(312) 353-5300

Dated: June 22, 2022