# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 20 CR 637 |
| | ) | Judge Manish S. Shah |
| JEREMIAH HARRIS, | ) | |
| | ) | |
| Defendant. | ) | |

## **DEFENDANT'S SENTENCING MEMORANDUM**

**BREEN & PUGH**
53 W. Jackson Blvd., Suite 1215
Chicago, Illinois 60604
(312) 360-1001 (t)
(312) 362-9907 (f)
tpugh@breenpughlaw.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 404
Chicago, IL 60604
(312) 909-0434 (t)
jherman@joshhermanlaw.com

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................1

II.  PROCEDURAL HISTORY ...........................................................................3

III.  OBJECTIONS AND CLARIFICATIONS TO THE PSR...............................5

IV.  SENTENCING MEMORANDUM................................................................5

  1.  Legal Standards...........................................................................................5

      a.  The Indelible Flaws in the Severe Child Pornography Guidelines............7

  2.  The § 3553(a) Factors ...............................................................................13

    a. "Just Punishment"—§ 3553(a)(2)(A) .......................................................13

    b. Nature and Circumstances of the Offense—§ 3553(a)(1)............................15

    c. History and Characteristics of Defendant—§ 3553(a)(1)............................21

        i.  Jeremiah's Difficult and Often Tragic Upbringing................................22

        ii.  Jeremiah's Sexual Abuse as a Minor and
             Exposure to Online Pornography ........................................................27

        iii. Jeremiah's Physical, Cognitive, and Mental Health Struggles ...........29

        iv. Jeremiah's Escape to and Embrace by the Cheer Community............32

        v.  Jeremiah's Pro-Social Traits and Positive
            Conduct in Structured Environments....................................................33

        vi. Jeremiah's Family Ties and Strong Community Support. ...................34

        vii.Jeremiah's Strong Potential for Rehabilitation,
            Diagnosis of Not Suffering from a Sexual Deviance
            Disorder, and Low Risk for Reoffending. ..............................................36

    d. A 72-Month Sentence Will be Sufficient to Comply

    with the Factors Set Forth in § 3553(a)(2)....................................................39

        i.  The Need to Reflect the Seriousness of The Offense
            and Promote Respect for The Law, § 3553(a)(2)(A). ..............................40

        ii.  The Need to Provide Adequate Deterrence and to Protect
            The Public from Further Crimes, § 3553(a)(2)(B)-(C). .........................42

        iii. The Purposes Behind § 3553(a)(2)(D), Specifically
            Providing Effective Medical Treatment, Will Be Met Through
            Treatment Programs on Supervised Release, and Would be
            Impaired by a Longer Than Necessary Term of Custody. ...................45

        iv. A 72-Month Sentence Will Help Minimize the Risk of Abuse to
            Jeremiah in a Custodial Setting............................................................46

e. A 72-Month Sentence Will Avoid Unwarranted
Sentencing Disparities—§ 3553(a)(6)............................................................47

IV. CONCLUSION ...........................................................................................................48

# TABLE OF AUTHORITIES

**Cases**

*Koon v. United States*, 518 U.S. 81 (1996) ............................................................... 6, 46

*Miller v. Alabama*, 567 U.S. 460 (2012) ............................................................... 31, 32

*Pepper v. United States*, 562 U.S. 476 (2011) ......................................................... 5, 6

*Ruiz v. United States*, 5 F.4th 839 (7th Cir. 2021) ...................................................... 31

*Schepers v. Commissioner*, 691 F.3d 909 (7th Cir. 2012) ........................................... 40

*United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) ............................................... 41

*United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) ................................................. 43

*United States v. Biddle*, 2014 U.S. Dist. LEXIS 143733
    (Case No. 1:13-CR-50-TLS; N.D. Ind. Oct. 9, 2014) ............................................ 11

*United States v .Cabrera*, 567 F.Supp.2d 271 (D. Mass. 2008) .................................. 43

*United States v. Carty*, 264 F.3d 191 (2d Cir. 2001) .................................................. 44

*United States v. Crespo-Rios*, No. 08-208 (JAG), 2015 U.S. Dist. LEXIS 144498,
    (Case No. 08-208, D.P.R. Oct. 19, 2015) ................................................. 41, 47, 48

*United States v. Cull*, 446 F.Supp.2d 961 (E.D. Wisc. 2006) ............................... 43, 44

*United States v. D.M.*, 942 F.Supp.2d 327 (E.D.N.Y. 2013) ......................................... 7

*United States v. D.W.*, 198 F.Supp.3d 18 (E.D.N.Y. 2016) .......................................... 46

*United States v. Darby*, 2017 U.S. Dist. LEXIS 44558
    (Case No. 2:16CR36, E.D. Va. Mar. 27, 2017) ...................................................... 47

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) ................................... 7, 9, 10, 11

*United States v. E.L.*, 188 F.Supp.3d 152 (E.D.N.Y. 2016) ......................................... 20

*United States v. Garate*, 543 F.3d 1026 (8th Cir. 2008) ......................................... 40, 42

*United States v. Hill*, 645 F.3d 900 (7th Cir. 2011) ...................................................... 5

*United States v. Huffstatler*, 571 F.3d 620 (7th Cir. 2009) ........................................ 10

*United States v. Jacob*, 631 F.Supp.2d 1099 (N.D. Iowa 2009) ................................ 10

*United States v. Johnson*, 588 F.Supp.2d 997 (S.D. Iowa 2008) ............................... 13

*United States v. Kelly*, 868 F.Supp.2d 1202 (D.N.M 2012) ........................................ 12

*United States v. Lara*, 905 F.2d 599 (2d Cir. 1990) .................................................... 46

*United States v. LaVallee*, 439 F.3d 670 (10th Cir. 2006) .......................................... 46

*United States v. Lopez*, 634 F.3d 948 (7th Cir. 2011)....................................................5

*United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008)............................................45

*United States v. McNerney*, 636 F.3d 772 (6th Cir. 2011)...........................................12

*United States v. Meillier*, 650 F.Supp.2d 887 (D. Minn. 2009)..................................41

*United States v. Moore*, 784 F.3d 398 (7th Cir. 2015) ................................................6

*United States v. Parish*, 308 F.3d 1025 (9th Cir. 2002) .......................................45, 46

*United States v. Pelloski*, 31 F.Supp.3d 952 (S.D. Ohio 2014).....................................7

*United States v. Pineyro*, 372 F.Supp.2d 133 (D. Mass 2005) ..................................45

*United States v. Polito*, 215 Fed.Appx. 354 (5th Cir. 2007) ..................................32, 41

*United States v. Pressley*, 345 F.3d 1205 (11th Cir. 2003)..........................................44

*United States v. Prisel*, 316 Fed.Appx. 377 (6th Cir. 2008) .......................................41

*United States v. Pyles*, 862 F.3d 82 (D.C. Cir. 2017)..................................................12

*United States v. Qualls*, 373 F.Supp. 2d 873 (E.D. Wis. 2005)...................................44

*United States v. R.V.*, 157 F.Supp.3d 207 (E.D.N.Y. 2016) ..........................12, 13, 40

*United States v. Robinson*, 669 F.3d 767 (6th Cir. 2012)............................................11

*United States v. Santoya*, 493 F.Supp.2d 1075 (E.D. Wis. 2007) ...............................6

*United States v. Stall*, 581 F.3d 276 (6th Cir. 2009) ..................................................41

*United States v. Stern*, 590 F.Supp.2d 945 (N.D. Ohio 2008)....................................32

*United States v. Stone*, 575 F.3d 83 (1st Cir. 2009)...................................................12

**Statutes**

18 U.S.C. § 2251(a) ......................................................................................................4

18 U.S.C. § 2252A(a)(2)(A).............................................................................................4

18 U.S.C. § 2422(b) .......................................................................................................4

18 U.S.C. § 2423(b) .......................................................................................................4

18 U.S.C. § 3553(a)(1) .........................................................................................*passim*

18 U.S.C. § 3553(a)(2) .........................................................................................*passim*

18 U.S.C. § 3553(a)(2)(D)..............................................................................................45

18 U.S.C. § 3553(a)(6) ..................................................................................................47

720 ILCS 5/11-1.50(c).....................................................................................................15

Fla. Stat. § 800.04(4)(a)(1) ............................................................................................15

Fla. Stat. § 775.082 ........................................................................................................15

## Guidelines

U.S.S.G. § 2G2.1.................................................................................8, 10

U.S.S.G. §2G2.2..............................................................................*passim*

## Rules

Federal Rule of Criminal Procedure 32(c) ....................................................1

## Other Sources

Hasinoff Amy Adele *Teenage Sexting is Not Child Porn*,
 N.Y. Times, Apr. 4, 2016 .........................................................................18

Sifferlin, Alexandra *Teen Sexting Has Become Even More Common,
 Research Says*, Time, Feb. 26, 2018 ........................................................18

Stabenow, Troy *Deconstructing the Myth of Careful Study: A Primer on the
 Flawed Progression of the Child Pornography Guidelines*, Jan. 1, 2009 ................9

Ristroph, Alice *Sexual Punishments*,
 15 Colum. J. Gender & L. 139, 159-60 (2006)...................................45, 46

U.S. Sentencing Comm'n, 2012 Report to the Congress
 Federal Child Pornography Offenses ..........................................................8

U.S. Sentencing Comm'n, *The History of the
 Child Pornography Guidelines* (2009).........................................................8

Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs.
 Severity of Punishment*, p. 1, The Sentencing Project, Nov. 2010 ........................42

Victor C. Strasburger, M.D., et. al., *Teenagers, Sexting and the Law*,
 143 American Academy of Pediatrics 1 (2019) .......................................18

Defendant **JEREMIAH HARRIS,** by and through his attorneys, **TODD S. PUGH** and **JOSHUA G. HERMAN**, pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3553(a), respectfully submits the following Sentencing Memorandum. As set forth below, a sentence of 72 months of incarceration followed by an 8-year period of supervised release is sufficient but is not greater than necessary.

> *Mercy without justice is the mother of dissolution.*
> *Justice without mercy is cruelty.*
> *-- Thomas Aquinas*

## I.    <u>INTRODUCTION</u>

The extensive, extraordinary, and unique mitigation submitted to the Court provides the lens through which both Jeremiah Harris ("Jeremiah") and his serious offense conduct must be seen to truly appreciate the complexity of this case. To accept the narrative that this case is just another example of a bad actor abusing his public status to prey on others would be both natural and easy. But such a simplistic, sound-bite narrative would do an injustice to the difficult facts of the case that we must collectively confront. The reality is that Jeremiah is both victimizer and victim. The trauma he experienced as a child normalized his skewed version of what he understood to be appropriate relationships. No one was there to stand up for him when he was sexually assaulted as a minor. He is grateful that is not the case for his victims in this case, to whom he is profoundly remorseful.

Nor did Jeremiah position himself within the Cheer community to access minors. To the contrary, it was the Cheer community that raised and nurtured him,

1

and which gave him a chance to escape the darkness, poverty, and hopelessness of his homelife. But it was this same Cheer community that fostered, encouraged, and often required mixed-age associations where inappropriate relationships often became unspoken realities. Those relationships included rampant "sexting" and sharing of nude images and videos via social media, which is more common amongst teenagers than we may want to acknowledge. Further, it cannot be ignored that during the offense conduct, Jeremiah was an older teenager himself, and due to his cognitive and emotional challenges, he was functionally younger than his actual age.

Lastly, and perhaps most importantly for the sentencing decision before the Court, experts who have evaluated Jeremiah conclude that his offense conduct is *not* the product of pedophilia, hebephilia, sexual deviance, or even anti-social behavior, and that he poses a low risk for recidivism. The government appreciated these mitigating factors when it offered a plea agreement that included only a 5-year, rather than a 15-year mandatory minimum.

The facts here belie a pop narrative of "celebrity gone amok" and cannot, in any manner, provide a transparent view of this case. The historical narrative of Jeremiah's life ultimately answers the key question before the Court—what individualized sentence will serve as just punishment? Just punishment is not imposing a sentence that ignores or even minimizes the overwhelming mitigation, the true roots of the offense conduct, and Jeremiah's undisputed potential for rehabilitation. Just punishment is not a lengthy term of incarceration that will keep Jeremiah from receiving desperately needed rehabilitative therapy and community

2

support. Just punishment recognizes that Jeremiah will be forever labeled with the scarlet letter of a child sex offender and that he has lost virtually everything, except, thankfully, the support from his extended surrogate family and loved ones.[1] Just punishment balances the harms that Jeremiah has inflicted, with those he has suffered. Just punishment will give Jeremiah a chance at life.

Just punishment includes mercy and necessarily ignores populist notions that punishment is measured only by the harms caused. Indeed, sentencing courts must consider a defendant's unique personal history and characteristics and the most effective way to provide rehabilitative treatment. 18 U.S.C. § 3553(a). We are all stakeholders in this young man's success and each of us has an obligation in the sentencing process to ensure that Jeremiah thrives in his return to the community.

## II.     <u>PROCEDURAL HISTORY</u>

Jeremiah submitted to a candid custodial interview with law enforcement officers after they executed a warrant on September 17, 2020. The criminal complaint alleged that from December 2018 and continuing through March 2020, Jeremiah "knowingly employed, used, persuaded, induced, enticed, and coerced a minor, namely Minor 1, to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, which visual depiction defendant knew and had reason to know would be transported and transmitted using any means and facility

---

[1] Attached hereto as Exhibit A is an Index of video testimonials and character letters from Jeremiah's wide support network. That material, along with the other voluminous records and reports referenced in the Index have been made available to the Court by Probation as attachments to the Defense Version of the Offense.

of interstate and foreign commerce, and which visual depiction was transported and transmitted using any means and facility of interstate and foreign commerce" in violation of 18 U.S.C. § 2251(a).

On December 10, 2020, the grand jury returned a seven-count indictment charging Jeremiah with production of child pornography occurring between December 2018 and March 2020, in violation of 18 U.S.C. § 2251(a) (Count One); enticement of a minor occurring on May 3, 2019, in violation of 18 U.S.C. § 2422(b) (Count Two); receipt of child pornography between July 2020 and August 2020 in violation of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1) (Count Three); production of child pornography between July 2020 and August 2020 in violation of 18 U.S.C. § 2251(a) (Count Four); production of child pornography between February 2019 and May 2019 in violation of 18 U.S.C. § 2251(a) (Count Five); production of child pornography between August 2017 and May 2019 in violation of 18 U.S.C. § 2251(a) (Count Six); and, traveling in interstate commerce for the purpose of engaging in illicit sexual conduct on May 2, 2019 in violation of 18 U.S.C. § 2423(b) (Count Seven).

On February 10, 2022, Jeremiah pled guilty pursuant to a negotiated plea agreement to Counts 3 and 7 of the Indictment. (Dkt. #55). The plea agreement removed the otherwise applicable 15-year mandatory minimums and subjected Jeremiah to a 5-year mandatory minimum sentence.

### III. OBJECTIONS AND CLARIFICATIONS TO THE PSR

Counsel has no technical objections or clarifications to the PSR. However, and as discussed in greater detail below, counsel disagrees with many of the inferences and conclusions drawn from the admitted and stipulated facts.

### IV. SENTENCING MEMORANDUM

#### 1. Legal Standards

While the defense does not contest the advisory guideline calculation, as the Court is aware, the Federal Sentencing Guidelines serve as a "starting point" and "initial benchmark" when determining a just and appropriate sentence. *See Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Pepper v. United States*, 562 U.S. 476, 490 (2011); *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall*, 552 U.S. at 49); *United States v. Hill*, 645 F.3d 900, 905 (7th Cir. 2011). In this unique case, the guidelines have even more of a diminished role in the imposition of a just sentence. To various degrees, and largely due to the overwhelming mitigation in this case, the parties agree on that important point, as evidenced by the fact that the government permitted Jeremiah to plead to a 5-year mandatory minimum rather than the originally applicable 15-year mandatory minimum.

Thus, while the Court is obligated to calculate the guideline range, this case must be determined based on consideration of the § 3553(a) factors to arrive at a just and merciful sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a). *See United States v. Lopez*, 634 F.3d 948, 953-954 (7th Cir. 2011) (internal citations omitted) ("the Guidelines are, after

5

all, guidelines [that] must be considered seriously and applied carefully…. In the end, however, the defendant's sentence is the responsibility of the district judge, after careful consideration of all the relevant factors under 18 U.S.C. § 3553(a).").

Adequate consideration of the § 3553(a) sentencing factors helps ensure that the sentencing decision is individualized, as it must be. The Supreme Court made this point clear when it emphasized that the punishment imposed "should fit the offender and not merely the crime." *Pepper*, 562 U.S. at 487-88 (citations omitted). *See also Gall*, 552 U.S. at 52, (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); *see also United States v. Moore*, 784 F.3d 398, 405 (7th Cir. 2015) (quoting *Gall*, 552 U.S. at 49-50) ("The court must consider all of the section 3553(a) factors, making 'an individualized assessment based on the facts presented.'").

The "sufficient, but not greater than necessary" standard—also known as the "parsimony" clause—is the "overarching provision" of § 3553(a). *Kimbrough*, 552 U.S. at 101. By its terms, that provision instructs the Court to consider a sentence that is the *least* severe, *i.e.*, not greater than necessary. *See, United States v. Santoya*, 493 F.Supp.2d 1075, 1077 (E.D. Wis. 2007) ("This is the so-called 'parsimony provision,' which requires district courts to impose the minimum punishment needed to satisfy the purposes of sentencing—just punishment, deterrence, protection of the public and rehabilitation of the defendant."). In this unique case and based on the mitigation alone, the Court has ample authority to sharply depart from the "starting point" provided by the advisory guidelines. Still, counsel must highlight the inescapable fact

that those guidelines have been subjected to widespread criticism, which provides even more justification to question and deviate from them.

### a. The Indelible Flaws in the Severe Child Pornography Guidelines

Federal courts, the Sentencing Commission, and even the Department of Justice have all criticized the child pornography guidelines. Some of this criticism has included outright rejection of their application by numerous federal courts. For instance, Judge Weinstein from the Eastern District of New York opined as follows:

> the child pornography Guidelines are "fundamentally different from most and . . . unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010). Acceptance of this fact enhances a sentencing court's ability to properly comply with its duty to impose sentences that reflect the statutory goals of sentencing and are based on a required individualized assessment of the facts presented.

*United States v. D.M.*, 942 F.Supp 2d 327, 352 (E.D.N.Y. 2013). *See also United States v. Pelloski*, 31 F.Supp.3d 952, 955-56 (S.D. Ohio 2014) (quotation and citations omitted) ("There is widespread agreement among judges, lawyers and legal scholars that the guidelines for child pornography offenses are seriously flawed….. Indeed, the belief that the child pornography sentencing guidelines are flawed is shared by the Sentencing Commission and the United States Department of Justice.").[2]

---

[2] *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) exemplifies the Court's discretion to deviate from the child pornography guidelines set forth in U.S.S.G. § 2G2.2 pursuant to *Kimbrough*. In *Dorvee*, the Second Circuit concluded that a 240-month sentence for distribution of child pornography was substantively unreasonable. *Id.* at 183. After a thorough analysis that discredited the rationales behind the strict guidelines for non-production offenses, the Second Circuit wrote: "District judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2—ones that can range from non-custodial sentences to the statutory maximum—bearing in mind that

Part of the peculiar and troubling nature of the child pornography guidelines is that they have been amended nine times since their inception in 1987, with each amendment increasing, sometimes dramatically, the severity of the base offense level and adding specific offense characteristics. For instance, the base offense level for receiving child pornography was 13 at the inception of the guideline. In response to a Congressional directive, the Commission raised the base offense level to 15 in 1991. Then, the base offense level increased to 17 in November 1996. Section 2G2.2 was amended in 2000 and 2003 to add specific offense characteristics, but the base offense level remained at 17 for receipt of child pornography. In 2004, and in response to another Congressional directive, the base offense level increased markedly from 17 to 22. *See generally* U.S. Sentencing Comm'n, *The History of the Child Pornography Guidelines* (2009).[3] The guideline for production cases was also ratcheted up over the years based primarily on Congressional directives. In 1987, the base offense level for § 2G2.1 was 25. In 1996, the base offense level was increased to 27 pursuant to a Congressional directive. And in 2004, in response to the PROTECT Act, the base offense level shot up from 27 to 32 while adding a host of enhancements. *See* U.S. Sentencing Comm'n, 2012 Report to the Congress: Federal Child Pornography Offenses, p. 249.[4]

---

they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *Id.* at 188.

[3] Available at: https://bit.ly/3Hnmqpj (last visited June 15, 2022).

[4] Available at: https://bit.ly/3b2gxBz (last visited June 15, 2022).

The Commission has long criticized these congressionally directed increases in the non-production child pornography guidelines. In 1991, when Congress considered directing the Commission to revoke a lower base offense level for receipt of child pornography, the Chair of the Commission informed the House of Representatives that the proposed action "'would negate the Commission's carefully structured efforts to treat similar conduct similarly and to provide proportionality among different grades of seriousness,' and would instead 'require the Commission to rewrite the guidelines for these offenses in a manner that will reintroduce sentencing disparity among similar defendants.'" *Dorvee*, 616 F.3d at 185 (citing Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines*, Jan. 1, 2009, at pp. 4-9).[5] The Commission also opposed the two-level enhancement for computer use that was added in 1996 on the grounds that it failed to distinguish between serious and ordinary offenders. *Dorvee*, 616 F.3d at 186. After the latest increases, the Commission sought permission to revise the guidelines using its expertise and review of empirical evidence, which it had been unable to do in response to Congressional directives. *See, United States v. Jenkins*, 854 F.3d 181, 188 (2d Cir. 2017) (quoting *Dorvee*, 616 F.3d at 184-86 ("we observed that the Sentencing Commission has not been able to apply its expertise but instead has increased the severity of penalties 'at the direction of Congress,' despite 'often openly oppos[ing] these Congressionally directed changes.'").

---

[5] Available at: https://bit.ly/3OhpPIp (last visited June 15, 2022).

Counsel recognizes that much of the criticism has been levied against U.S.S.G. § 2G2.2, the guideline that covers production, receipt, and transportation offenses, rather than U.S.S.G. § 2G2.1, which is the primary driver of the guidelines in this case. However, courts have also criticized U.S.S.G. §2G2.1 for the same or similar reasons directed at § 2G2.2. *See*, *e.g.*, *United States v. Jacob*, 631 F.Supp.2d 1099, 1115 (N.D. Iowa 2009) (rejecting § 2G2.1 on "categorical, policy grounds" also present in § 2G2.2).[6]

A key and common criticism of the child pornography guidelines is that they do not distinguish between the most serious offenders and the run-of-the mill cases because the specific offense characteristics apply in nearly every case and are thus "inherent" to the offense itself. *See Jacob*, 631 F.Supp.2d at 1114-15; *Dorvee*, 616 F.3d at 186. Due to these "inherent" enhancements, the Second Circuit in *Dorvee* observed how "adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories." *Id*. at 187. That non-differentiating result is "fundamentally incompatible with § 3553(a)." *Id*. *See also Jenkins*, 854 F.3d at 190

---

[6] In *United States v. Huffstatler*, 571 F.3d 620, 623 (7th Cir. 2009), the Seventh Circuit rejected a defendant's argument that U.S.S.G. § 2G2.1 "must" be disregarded as invalid if the sentencing court found that they resulted from methodological flaws, such as the lack of empirical fact-finding. Counsel does not make that argument. If anything, *Huffstatler*, reinforced the sentencing court's ability to disagree with the guidelines based on an unsound methodological footing and then deviate from the guidelines accordingly pursuant to *Kimbrough*. Further, *Huffstatler* tellingly noted how it was "perhaps for good reason, the government did not take issue with Huffstatler's premise that the child-exploitation guidelines lack an empirical basis." *Id*.

("Thus, here, as in *Dorvee*, § 2G2.2 cannot 'bear the weight assigned it because the cumulation of repetitive, all-but-inherent, enhancements yielded, and the district court applied, a Guideline range that failed to distinguish between Jenkins's conduct and other offenders whose conduct was far worse. …. It was substantively unreasonable for the district court to have applied the § 2G2.2 enhancements in a way that placed Jenkins at the top of the range with the very worst offenders where he did not belong.").

One of the most blatant examples of an "inherent" offense characteristic is the use of a computer (U.S.S.G. § 2G2.2(b)(6)), for which Jeremiah receives two additional offense level points for each offense and stipulated offense. While this enhancement may have been relevant when first enacted, today virtually every child pornography offense involves the use of a computer, and the enhancement therefore applies in nearly every case. Indeed, it did not take long before the Commission itself criticized this enhancement for failing to distinguish between serious and average offenders. *See, United States v. Biddle*, 2014 U.S. Dist. LEXIS 143733, at *18-19 (Case No. 1:13-CR-50-TLS; N.D. Ind. Oct. 9, 2014) (citation omitted) ("The Sentencing Commission has previously criticized the two-level computer enhancement, finding that the enhancement did not distinguish between serious commercial distributors of online pornography and run-of-the-mill users.").

Moreover, in Jeremiah's case, the use of a computer was also part of the offense conduct itself. *See, United States v. Robinson*, 669 F.3d 767, 778 (6th Cir. 2012) (discussing the enhancement for "use of a computer"). While this does not create a

11

"double counting" problem under case law, it nevertheless subjects the enhancement to reasoned criticism. Indeed, because it applies in almost every case, this offense characteristic fails to distinguish more serious offenders who deserve greater punishment.

Thus, some of the enhancements that elevate Jeremiah's sentencing range do not necessarily capture distinct harms. They describe conduct that is "essentially inherent to the crime itself," not conduct that is uniquely aggravating or that evidences greater harms. *United States v. Kelly*, 868 F.Supp.2d 1202, 1208-09 (D.N.M 2012). *See, United States v. Pyles*, 862 F.3d 82, 97-98 (D.C. Cir. 2017) ("This panoply of enhancements applies so frequently that it serves to conflate offenders rather than differentiate among them.").

The criticism of the child pornography guidelines has led some to conclude that those guidelines are not the product of the Commission's deliberation, but rather of Congressional manipulation resulting in an overly harsh sentencing regime based more on politics and morality than empirical evidence. *See, United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009) ("we wish to express our view that the sentencing guidelines at [USSG § 2G2.2] are in our judgment harsher than necessary"); *United States v. McNerney*, 636 F.3d 772, 777 (6th Cir. 2011) (citations omitted) (recognizing that "some courts and commentators have questioned the wisdom of the congressionally-directed Child Pornography Sentencing Guideline because they were the product of Congressional mandate rather than the Commission's preferred systematic, empirical approach"); *United States v. R.V.*, 157 F.Supp.3d 207, 252

(E.D.N.Y. 2016) ("most serious non-production child pornography guidelines were amended at the direction of Congress rather than through the Sentencing Commission's empirical approach."); *United States v. Johnson*, 588 F.Supp.2d 997, 1003 (S.D. Iowa 2008) ("As far as this Court can tell, [the Congressional modifications to the child pornography guidelines] do not appear to be based on any sort of empirical data, and the Court has been unable to locate any particular rationale for them beyond the general revulsion that is associated with child exploitation-related offenses."). While the § 3553(a) factors in this case amply justify a significant variance from the advisory guidelines, these well-reasoned criticisms of the child pornography guidelines should also be kept in mind.

## 2.   The § 3553(a) Factors

### a. "Just Punishment"—§ 3553(a)(2)(A)

It is common practice for defense attorneys, prosecutors, and federal judges to address the issue of "just punishment" at the end of their sentencing presentations and oral pronouncements of sentence, respectively. That is typically because one often cannot determine what is "just punishment" without first appreciating the nature and circumstances of the offense, as well as the history and characteristics of the defendant, are logically set forth in § 3553(a)(1), which immediately precedes the "just punishment" clause in (a)(2)(A). However, in this particular case, judicial contemplation of the question of "just punishment" at the outset of the § 3553(a) analysis is both necessary and helpful.

On its own, the term "just punishment" is vague and amorphous. The qualifier "just" has several definitions, including "having a basis in or conforming to fact or reason" and "being what is merited" or "deserved."[7] Punishment must therefore be objectively deserved to be "just." Of course, punishment "greater than necessary" cannot be "just" based on the structure of § 3553(a) and the lodestar parsimony clause.

We begin with the concept of "just punishment" because this case, more than any other that undersigned counsel have encountered, requires confronting what is "just." For its part, Probation's excessive recommendation is driven in large part by the offense conduct of Count Seven, which is no doubt serious on its own. But how do we calculate what is "just" under these circumstances? An overview of the potential sentencing ranges for that offense conduct illustrates the wide range of what has been deemed "just," and further provides strong support for a sentence that is dramatically lower than what Probation suggests.

Probation notes that the guidelines for the Count Seven offense would be 97 to 121 months prior to acceptance of responsibility (Level 30, CH I), which translates to 70-87 months following acceptance (Level 27, CH I). (Recommendation, p. 4). Probation then opines that a sentence of at least 10 years would be appropriate. (*Id.*). Yet, and simply for that offense conduct, it then recommends more than double that term. (Recommendation, p. 1). In considering what is "just," it should be noted that under Florida law, sexual activity between a 15-year-old and a 19-year-old, would be

---

[7] *See* Merriam-Webster, available at: https://www.merriam-webster.com/dictionary/just (last visited, June 15, 2022).

punishable by a max of 15 years with no mandatory minimum. (Fla. Stat. §§ 800.04(4)(a)(1) and 775.082). And in Illinois, the offense would be a Class A misdemeanor. (720 ILCS 5/11-1.50(c)). Even though the offense conduct is undoubtedly serious and for which Jeremiah is genuinely contrite, under no circumstances could a sentence close to Probation's recommendation be considered "just punishment." Thus, we submit that the Court consider what is "just" first and foremost as it considers the § 3553(a) factors.

### b. Nature and Circumstances of the Offense—§ 3553(a)(1).

In determining the sentence to be imposed, the Court must consider the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Nothing that counsel or Jeremiah say is meant to minimize or reframe the pain, hurt, and suffering that his victims have endured.

Jeremiah's victims' voices are heard, and he accepts their harms as described. His acceptance is colored with shame, contrition, and regret. Incarceration is not the low watermark of Jeremiah's life, rather it is his knowledge that he brought lasting pain to children. The written and video testimonials submitted by the defense are consistent and replete with a singular theme: Jeremiah emerged from childhood trauma with an uncanny ability to bring exuberance and joy to everyone around him. His criminal conduct here is the antithesis of all he tried to be, and his remorse is

boundless. Jeremiah respectfully submits that his victims be afforded *their* narrative of the nature and circumstances of his offenses.[8]

Several points of clarification are needed to contextualize the seriousness of the offense. No doubt, much attention will be made of Jeremiah's public status vis-à-vis the Netflix *Cheer* series. Arguments may be made that the offense is aggravated because of that status. It may even be offered that Jeremiah used that status as a vehicle to prey on minors and commit the offense conduct. Nothing is further from the truth. Those easy but false narratives should be rejected. This is not a case where a "celebrity" used his status to abuse others; nor is this a case involving an older adult who used a position of trust and power to victimize others.

Indeed, most of the offense conduct occurred well before the airing of *Cheer* in January of 2020. For instance, the offense conduct reflected in Count Three and Stipulated Offense No. 3 (corresponding to Count Four of the Indictment) is the only offense conduct that occurs after *Cheer* aired. That offense conduct involved then 20 or 21-year-old Jeremiah paying a 17-year-old to send him sexual photos via a social media platform. Notably, neither the victim nor his friends were part of the larger Cheer community.

More specifically, the FBI interview report of Minor 2's friend, attached to the Government's Version, indicates that he did not know Jeremiah prior to a party where they met. Likewise, Minor 3 stated in his interview that he had "never heard"

---

[8] Further details concerning the offense conduct are set out in Defendant's Version of the Offense, which is appended to the PSR and available for the Court's review. Counsel adopt those details herein rather than restate them due to concerns for the victims' privacy.

16

of Jeremiah when his friend Minor 2 shared a Snapchat message that he had received from Jeremiah. When describing how he met Jeremiah at a party in June 2020, Minor 2 told investigators that he "did not know, nor had he heard of, Jeremiah prior to this party." Minor 2 also shared that, on or about August 22, 2020, when he and his friend no longer wanted to send photos to Jeremiah, rather than just blocking Jeremiah on their own, they asked Jeremiah to pay them $500 each to stop communicating and block each other on social media, which Jeremiah paid.

Related to this offense conduct, Probation's suggestion that Jeremiah "used his financial ability to further his sexual exploitation of minors" must be clarified. (Recommendation, p. 3). Attached hereto as Under Seal Exhibit B, is a chart detailing all of Jeremiah's online financial transactions with others. The chart includes those transactions with the 17-year-old minor from Count Three and Stipulated Offense Three. All said and done, approximately $2,000.00 was exchanged. (*See also* Dkt. #55, Plea Agreement, p. 3). The detailed chart at Exhibit B, shows Jeremiah's other financial transactions were for altruistic and innocuous purposes. There is no evidence to support the assertion that Jeremiah used his financial ability derived from his status to commit the offense conduct.

None of this is to say that the Cheer community had nothing to do with the offense conduct. Quite to the contrary, some of the unspoken and unfortunate realities of the Cheer community provide mitigating context to the offense conduct, as is highlighted by the submitted video statements of Mr. Shannon Young, one of the co-owners of ICE All-Stars.

17

Mr. Young provides insight into the ICE Cheer program and the competitive Cheer world. He explains how teams are composed of competitors of significant age differences, and that the program requires close team bonding between those competitors. Mr. Young candidly observes that the blending of ages in the sport has been the "downfall" of All-Star cheerleading and that those in charge have "failed" the kids involved. Speaking about Jeremiah individually, Mr. Young becomes quite emotional when he emphasizes how Jeremiah is a victim himself of this broken system.

It is also essential to appreciate that the offense conduct involved sexting amongst teenagers, which is prevalent, as uncomfortable as that fact might be.[9] Crucially, Jeremiah did not solicit the images for distribution, sharing, or dissemination of any kind. Also significant is the fact that, after thorough review by law enforcement, there was no evidence on any of Jeremiah's digital devices of any searches for child pornography or queries for topics related to children. (PSR, p. 9, ¶53).

---

[9] *See*, Victor C. Strasburger, M.D., et. al., *Teenagers, Sexting and the Law*, 143 American Academy of Pediatrics 1 (2019) (available at, https://bit.ly/3n9BwFA) (last visited June 19, 2022) (analyzing more than 40 studies to determine that the prevalence of sexting in teen relationships); Amy Adele Hasinoff, *Teenage Sexting is Not Child Porn*, N.Y. Times, Apr. 4, 2016 (available at, https://nyti.ms/3tXgjCv) (last visited June 19, 2022) ("Studies have shown that roughly one-third of 16- and 17-year-olds share suggestive images on their cell phones."); Alexandra Sifferlin, *Teen Sexting Has Become Even More Common, Research Says*, Time, Feb. 26, 2018 (available at, https://bit.ly/3n6nmoC) (last visited June 19, 2022) (15% of surveyed teenagers reporting sending sexts and 27% receive them). *See also* D. Newby Letter ("This is going on in every High School in America, not just cheer gyms…Jerry would be a great person to help educate parents and teenagers about Social Media.").

In short, the seriousness of the offense conduct should not be further aggravated by viewing Jeremiah as a deviant predator who stalked those in the Cheer community to access victims. Rather, it was the Cheer community that raised and nurtured him. This was a community that Jeremiah loved deeply, accepted him, allowed him to display his passion and empathy, and showed him that another world was possible other than one marked by poverty and hopelessness. But due to the widespread and unmonitored use of social media and sexting amongst different peer groups, this Cheer environment also corrupted Jeremiah's already skewed perception of relationships and contributed to the offense conduct for which he accepts full responsibility.

Jeremiah's recognition of the seriousness of the offense is reflected in his deep remorse. This remorse is self-evident in the Bodymap video that has been submitted to the Court for review.[10] In his own words, Jeremiah states as follows:

> I used the mirror to represent my inappropriate behavior on social media. The mirror is gray because I did not like what I saw. I had to face what I did. I was an adult, and I took advantage of these teen boys. I was wrong. I caused harm. I was selfish and I exploited their weakness. It was all me. I realized what I did was wrong, and it was bad and I truly do feel sorry for it. And I am ashamed of myself. I know the feelings that this kind of abuse causes because it lives inside of "Little Jerry." I

---

[10] On August 26, 2021, Jeremiah participated in an audio-recorded interview with Julie Urbanik, Ph.D. at the Metropolitan Correctional Center. Dr. Urbanik then prepared a "Bodymap" video along with a report. Both the report and the video were attached to the Defense Version and have been provided to the Court. In her report, Dr. Urbanik explains how the Bodymap video serves "as the main data point for understanding how Jeremiah Harris sees his own life, his own communities, and how well he can be self-reflective." Dr. Urbanik's Bodymap video is not simply a visual timeline. Instead, it is a distinctly qualitative approach for presenting one's autobiography that allows the subject to use all possible communications tools to tell his life story. Importantly, as Dr. Urbanik writes, the Bodymap "is a tool to demonstrate how capable [Jeremiah] is of being self-reflexive and self-aware of his actions."

> want the people that I hurt to know that I accepted responsibility for my crimes, and I will continue to participate in therapy to better myself. I will be held accountable for my action and my hope is that this helps you in your recovery.

Bodymap video, 19:36-20:38. Those words reflect Jeremiah's recognition of the seriousness of his crimes and his wholesale acceptance of responsibility. His remorse and acceptance of responsibility was also recognized in the PSR. Indeed, the moment he was confronted by the FBI, he spoke, in the Special Agent's own words, "frankly and upfront" and was "very forthcoming and very honest." *See* PSR, p. 10, ¶¶61, 64.

Jeremiah has pled guilty to this extraordinarily serious offense conduct knowing that he will spend more years in prison and that while incarcerated, he will likely be targeted for being a child sex offender. Indeed, his public profile and the nature of his charges–among other attributes–have made Jeremiah the target of inmate exploitation at the MCC. He accepts responsibility for the offense knowing that he will live the rest of his life with the stigma of being labeled as a sexual predator, even though he is a first-time offender with no criminal history. He knows that, in addition to bearing that indelible and awful label, he must also comply with numerous restrictive and invasive post-release conditions greatly limiting his liberty long after his actual sentence is served. *United States v. E.L.*, 188 F.Supp.3d 152, 173 (E.D.N.Y. 2016) ("While correction is warranted, general and specific deterrence are achieved by a non-incarceratory sentence. Defendant will have to live with the serious collateral consequences of his conviction: he will perpetually bear the scarlet letter that comes with being a convicted felon and registered sex offender."). Additionally, Jeremiah will be saddled with a lifetime of state sex offender registration and

residency requirements. He accepts the enduring shame that will follow him for the rest of his life due to the collateral consequences that make sex offenses qualitatively different from other crimes.

Again, these points are not raised to detract from the seriousness of the offense conduct or minimize it in any manner, but rather to highlight the severe consequences that Jeremiah has accepted and his recognition of the gravity of his crimes. As noted above at the outset of this section, the victims' voices must be and are heard. Their harms are accepted as described.

### c. History and Characteristics of Defendant—§ 3553(a)(1).

In determining the sentence to be imposed, the Court must also consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). It is difficult, if not impossible, to articulate Jeremiah's personal history and characteristics. As enumerated in Exhibit A, counsel has provided the Court with numerous records, letters, video recordings, records, and expert reports that provide holistic insight of Jeremiah. Most notable is the Bodymap video, referenced above, in which Jeremiah describes his childhood journey.[11] Taken together, this material provides the lens through which this case must be understood, as it shows that Jeremiah is the tragic product of extraordinarily difficult circumstances that plagued his formative years and undoubtedly marred his judgment.

---

[11] Counsel intends to publish the Bodymap video at the sentencing hearing, as well as other videos.

Those circumstances include neglect; paternal abandonment; maternal death; homelessness; food scarcity; rape at age 13; struggles with his sexual identity; and childhood exposure to online and social media pornography that warped his conception of "normal" relationships. These awful experiences exacerbated underlying cognitive and emotional deficits that adversely affected and stunted Jeremiah's mental health conditions. While Jeremiah was legally an adult at the time of the offense conduct, he was technically in late adolescence and very much underdeveloped, particularly given his prior documented history of cognitive and emotional impairments that required intervention and remediation. However, and critically important, recent psychological evaluations conclude that Jeremiah poses a low risk of reoffending.

### i. Jeremiah's Difficult and Often Tragic Upbringing

Jeremiah experienced a childhood marred by poverty, homelessness, abuse, and neglect. To help illustrate the depths of those travails, the Court has been provided with chronologies that list events in Jeremiah's life from birth to age 21. These chronologies are well-sourced and corroborated, as the facts are based on records and interviews. In short, the chronologies provide a roadmap of Jeremiah's life.

They begin by noting how Jeremiah was born premature and with respiratory distress requiring that he be placed on a ventilator. Lizzie, Jeremiah's mother, developed an unusual and unhealthy relationship with him, as corroborated by many witnesses. For instance, she would only sleep on the couch with him, not her husband

22

or any of her other children.  (PSR, p. 17, ¶141). This couch was in a common area in the crowded two-bedroom house occupied by six other family members. Jeremiah never had a room of his own. (PSR, p. 17, ¶141). Jeremiah recalled how his mother Lizzie slapped him in the face and head and struck him with a belt. (PSR, p. 17, ¶143). Close family members note that Lizzie made Jeremiah completely dependent on her, and even alienated him from his siblings.  (*See,* M. Harris Letter; T. Bowman Letter). Jeremiah's sister Mahogany describes an unhealthy side of her brother's relationship with their mother:

> Jeremiah could never make his own observations or determine for himself something besides what Mom made him believe because it was just the two of them, all the time. She even slept on the couch with him every day of his life in our house, even when there was a bedroom available and a bed for her. He could have slept on the let-out couch. There was no privacy, no normalcy for him. Even when we were living in a hotel room with two beds (for 3 years while Mom was alive), Mom shared a bed with Jeremiah (he was a teenager).

(M. Harris Letter).

Jeremiah had virtually no relationship with his father and, to this day, he does not even know his real first name.  (PSR, p. 16, ¶137). Nor does he have any memories of his father and mother experiencing a normal marriage, including showing any affection toward each other. (PSR, p. 17, ¶140). This might not be surprising if Jeremiah's father was physically absent from his life, but it is truly shocking given the fact that his father was physically present, albeit fleetingly. Jeremiah's father barely acknowledged him in the rare occasions when he was present.  (PSR, p. 17, ¶139). (*See* J. Towne Letter) ("It is painfully clear Jerry had a difficult upbringing. Although he received much love and support from his mother in some aspects of his

23

life, Jerry has shared with me that he feels his father is mean and unloving."). When he was just nine years old, Jeremiah's father beat him so severely that Jeremiah developed a fear of him and did his best to avoid him. (PSR, p. 17, ¶143). Jeremiah describes how the "beating shook [him] to the core and made him not want to have a relationship with [his father]." (*Id.*). Even now, Jeremiah's father seems to express no personal connection with his son, as his letter only states: "I'm truly concerned for my son going to prison. This is not the life that his mother wanted." (N.H. Harris Letter).

In approximately 2009, the family experienced serious financial problems, which became untenable after the passing of Jeremiah's grandmother who had helped provide needed financial assistance. (PSR, pp. 17-18, ¶144). Water and electric services were disconnected, and Jeremiah and his family lived in a hotel until the utilities were reconnected. (PSR, p. 18, ¶144). Due to ongoing financial struggles, Jeremiah and his family were evicted from their home in 2013. As a result, Jeremiah ended up living in different hotels, and even in his car when a hotel was unavailable. (PSR, p. 18, ¶145). He recalls up to six people living in a single hotel room at one time. (*Id.*).

On March 13, 2016, Lizzie Bowman died after a long battle with lung cancer. This was an incredibly traumatic experience for Jeremiah, especially because he had spent days by her bedside in the hospital. (M. Bowman Letter) ("My lil brother was always with my mom so when things started to go bad he got to see it first hand."). Enclosed in the mitigation material is a short video of Jeremiah hugging his mother

24

as she was non-responsive in a hospital bed. Losing his mother was the "end of the world" for him. (PSR, p. 18, ¶147). Due to Lizzie's enveloping presence in his life, Jeremiah was completely adrift after her death. (M. Bowman Letter) ("After my mom passed, Jerry was on an island all alone."); (T. Bowman Letter) ("When my mother Lizzie passed away in March 2016, my brother lost his lifeline."). He and his siblings continued to live in hotels, but with even less guidance, as "everybody was fending for themselves" at that even more precarious time. (PSR, p. 18, ¶147).

The Cheer community began to fill the void left by Lizzie's death by giving Jeremiah loving and stable homes and families to live with when he could. The Cheer families treated Jeremiah as if he were one of their children. (S. Caballero Letter) ("Even though Jerry's mother passed away while he was in high school, he was such a great young man that he had multiple "moms" step up for him. They made sure that he would not be alone in life and treated him as one of their own children and you could tell how much it was appreciated by Jerry. He never tried to take advantage of his situation and was always looking for ways to help and give back for the support he was given."); (P. Towne Letter) ("When Jerry's mother tragically died, the cheer community put its arms around him, and, in many ways, became his surrogate family."); (L. Hamilton Letter) ("From that day forward, he slowly became part of our family, he became my son. I would pick him up every weekend at the motel he and his mom had been staying in, to stay with our family and then I would have to drop him back off at the motel with a biological father he had little to no relationship with. I drove home in tears every single time.").

25

Many letters submitted to the Court describe the difficulty that Jeremiah experienced growing up, much of which was not known to others at the time. The letters poignantly speak not only of the difficulties, but also of Jeremiah's perseverance. For example, N. Pryor writes as follows:

> Once you get past the sunshine you quickly learn that there are multiple layers to this kindred spirited young man. Immediately as a mom, you want to fix it. I was present when Jeremiah lost his mom. The loss of a mother is enough to tear some apart, but not Jeremiah. He continued to strive, persevere, and bring joy to everyone he came into contact with. Trying to be as supportive as I could after the loss of his mother, I quickly learned the magnitude of what he and his mother faced upon her death. A life of poverty, family crisis, and abandonment. The more and more you learned about the pressure of life he had had to endure at a very young and tender age the deeper appreciation I gained of his zest for life. How can anyone who experienced homelessness, drug raids, abandonment from family, and a single-parent household continue to thrive? It's amazing that Jeremiah was able to keep a smile on his face while always encouraging others. This young man has gone through everything imaginable but never allowed the pain and tragedy of what he experienced to hold him back.

(N. Pryor Letter). J. Houchens echoes many of these sentiments in her letter as she writes:

> Despite a horrific childhood, that should logically have resulted in an angry and resentful adult, Jeremiah somehow is a truly kind, generous, and hopeful person. Jeremiah was abandoned by his father and spent many of his childhood years homeless. For the last few years of his mother's life they lived in a rundown hotel. Jeremiah shared a bed with his mother who was dying of lung cancer. At night he would press his head against her back to hear if she was still breathing. The only thing Jeremiah had in abundance was uncertainty. They did not have a kitchen and he grew up with constant food insecurity, not knowing when they would eat next or what they would eat. Jeremiah never wanted anyone to feel sorry for him. He never asked for help. It wasn't until his mother died that we learned the extent of his poverty. After his mother's death, when people stepped in to help, he accepted the help with gratitude and humility.

(J. Houchens Letter); (A. Ringo Letter) ("The trials and adversities that this young man has been through in his short lifetime; could bring the strongest of people who are twice his age and beyond to their life shattering knees. His life of extreme poverty, homelessness, abandonment, and uncertainties is truly heartbreaking and unimaginable to those who love this incredible soul."); (J. Towne Letter) ("Jerry has been burdened with a difficult life which includes poverty, the pressures of being a gay black male, the traumas of losing his mother, being homeless, being bullied, and lacking a supportive father figure. Yet through all of this, Jerry retained his authentic, unassuming self that would never knowingly harm or speak negatively of anyone.").

In addition to these family traumas, Jeremiah also suffered from developmental disabilities at an early age. He was "non-verbal" in kindergarten testing necessitated an Individualized Educational Plan (IEP). Jeremiah would continue to have an IEP in school due to his disabilities and underdeveloped social and emotional skills. Yet, witness interviews reflected in the life chronologies also portray a young child who radiated joy despite his daunting challenges and hardships. His first-grade teacher found Jeremiah to be unforgettable, specifically in how he exhibited an early passion for cheerleading. This led her to arrange for Jeremiah to join a community cheerleading team when he was 6 years old.

### ii. Jeremiah's Sexual Abuse as a Minor and Exposure to Online Pornography

The Life Chronology chapter covering ages 11-15 describes how when he was just 11 years old, Jeremiah discovered pornography while he was attempting to

understand his own nascent sexual identity. He learned about homosexual sex from online pornography and then met an older "friend" online who taught him how to send nude photos. (PSR, p. 21, ¶174). Jeremiah was also a victim of physical sexual assault when he was only 13 years old, when he was raped by a 19-year-old by the side of a house. (PSR, p. 21, ¶172). Jeremiah knew the 19-year-old from his cheerleading gym. (PSR, p. 21, ¶172).[12] These experiences warped Jeremiah's view of "normal" relationships, especially given how they occurred alongside social media and within the ecosystem of the Cheer community.

Jeremiah was sexually assaulted again when he was 15 years old. (PSR, p. 21, ¶173). On that occasion it was a cab driver who was driving Jeremiah home from a visit to his dying mother at the hospital. Since he was too young to sleep in the hospital, the hospital social workers called a cab to drive him home. The cab driver propositioned this homeless 15-year-old for sex in exchange for money.

Jeremiah's painful trauma of these sexual assaults, childhood exposure to online pornography, upturned homelife, and homosexuality—combined with his fear of coming out to his mother and family due to the ostracization that would ensue— made it virtually impossible for him to develop normal relationships with his peers. On top of all of this, Jeremiah's middle school peers in Bolingbrook abused and bullied him because he was overweight, gay, and poor. Racism cannot be discounted. The

---

[12] The PSR describes this incident as "mutual anal penetrative sex on the side of the home." (PSR, p. 21, ¶172). Counsel must question the PSR's use of the word "mutual" to describe this encounter between a 19-year-old and a 13-year-old given its description of the offense conduct in this case. Jeremiah was sexually assaulted.

Chronology illustrates the divergence between Jeremiah's increasingly untenable and insecure homelife and the positive outlet Cheer provided him as he became more involved in that community.

### iii. Jeremiah's Physical, Cognitive, and Mental Health Struggles

Jeremiah's own youth and cognitive issues are essential factors when attempting to appreciate the offense conduct in this case and, in turn, what is "just punishment." Throughout his childhood and adolescence, Jeremiah underwent cognitive, psychological, and emotional testing. That testing, which is noted in the Life Chronologies provided to the Court, demonstrates severe language problems, reading comprehension deficits requiring remediation, a serious asthma condition, severe obesity, clinical depression, substantial family stress, and special education intervention through at least the age of 12. When he was 15, Jeremiah underwent neuropsychological testing that indicated a Full IQ score of 89, placing him in the 23rd percentile. At the time, he also had diagnoses of ADHD and depressive disorder. Recommendations included psychiatry for medication management, psychotherapy to address anxiety and depression, social work counseling, and occupational therapy. Psychological reports and assessments provided to the Court include references to domestic violence, diagnoses of depressive disorder, bipolar disorder, Asperger's disorder, and public aid benefits due to emotional disability. (PSR, p. 21, ¶168).

Jeremiah faced "intense bullying" in elementary school and middle school. (PSR, p. 20, ¶165). This bullying was largely due to his obesity, poverty, and undoubtedly had a racial component. As a result, he first began to experience suicidal

ideations in middle school. (PSR, p. 20, ¶165). Jeremiah turned to food to cope with the stress of the bullying and his tumultuous home-life. PSR, p. 21, ¶167). Consequently, he became very obese, which only fueled further bullying from cruel classmates, thus spurring more overeating and a vicious cycle ensued. (*Id*.). The bullying became worse in high school when he was teased for his clothing and his personal hygiene. (*Id*.). (C. Howard Letter) ("Kids made fun of Jeremiah because of his weight, his color, his clothes, and his odor."). He was even bullied for cheerleading, the one thing that gave him respite from the tumult of his home. (*Id*.); (L. Hamilton Letter); (W. Bowman Jr. Letter).

Still, Jeremiah did his best to put on a good face that did not reveal the depths of the trauma that he was experiencing. *See*, (Letter from A. Collins) ("I saw Jerry remain positive while being homeless and dealing with a sick guardian. Jerry always had a smile on his face. His attitude and behavior at Waubonsie never showed any struggle or anger. I always saw him smiling and full of energy."); (D. Howard Letter) ("He was fat. He didn't have good hygiene. His mom chose embarrassing clothes for him. He loved cheerleading. The odds were against him. Kids told him he was too fat to play with them. I saw it firsthand, being in school with him. In 6th grade, all the kids laughed when Jeremiah fell out of a chair. Surprisingly, Jeremiah never acted mean back. He poured out love, even when none was returned.").

The offense conduct largely took place when Jeremiah was between the ages of 17 and 20. While the victims in this case were younger, Jeremiah's cognitive issues most certainly lessened the age gap in terms of emotional and functional capacities.

That is especially the case with respect to Minor 3, who was seventeen years old, and the offense conduct that underlies Count Three and Stipulated Offense 3. While, legally speaking he was not himself a juvenile at the time, he was most certainly an adolescent "emerging adult" whose cognitive and emotional functioning was very much still in development, as even character witnesses attest to in their letters. *See,* (H. Hart Letter) ("I am writing to you because I want you to know the real Jerry Harris, not the defendant Jerry Harris. Jerry may be chronologically 21 years old now, but he is emotionally and mentally much younger than that.").

Jeremiah's relative youth and cognitive functioning is a critical consideration in this case. Courts have recognized that juvenile offenders must be treated differently, and the most severe sentences must be reserved for only the most incorrigible individuals who are simply not amenable to rehabilitation. Indeed, in *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court wrote that children are "constitutionally different from adults for the purposes of sentencing" because "juveniles have diminished culpability and greater prospects for reform" and "are less deserving of the most severe punishments." *Miller*, 567 U.S. at 471. Neurological science continues to develop, and it has been recently observed that brain development may not end until age 22. *See Ruiz v. United States*, 5 F.4th 839, 843 (7th Cir. 2021) (Wood, J., dissenting from denial of rehearing en banc) ("Neurological science continues to advance. Indeed, the American Association on Intellectual and Developmental Disabilities (AAIDD), a respected organization whose work is often

cited by the Supreme Court, now defines the end of the human intellectual development period as age 22, not age 18.").

Even prior to *Miller*, courts recognized a defendant's youth, both at the time of the offense conduct and at the time of events associated with the offense conduct, as strong mitigation that justified reduced sentences. *United States v. Polito*, 215 Fed.Appx. 354, 357 (5th Cir. 2007) (per curiam) (upholding a sentence of probation in child pornography pos session case when use began during adolescence); *United States v. Stern*, 590 F. Supp. 2d 945, 952-53 (N.D. Ohio 2008) (imposing a sentence of one year and one day in possession of child pornography case when defendant was 14 years old at the time he began viewing child pornography).

### iv. Jeremiah's Escape to and Embrace by the Cheer Community

The Cheer community was simultaneously Jeremiah's lifeline and undoing. It provided him with a glimpse of what life could be like without poverty and hunger. It showed him a loving and caring environment. It allowed him to be himself rather than living in shame as he discovered his own sexuality. Jeremiah expressed in the Bodymap video that participating in Cheer was like "amnesia for the pain that he was experiencing."

But, consistent with Mr. Young's observations, Jeremiah also notes that the Cheer community encouraged, and in fact required, youths across different age ranges, sometimes from 11 to 19, be together without parental guidance or supervision. This mixed environment led to the diminution of age in Jeremiah's mind. That is not to say that Jeremiah is not at fault. He has expressed sincere regret for

32

his conduct, which he acknowledges was wrong and hurt others, and he will live with that shame for the rest of his life. Still, the Cheer Community provides the backdrop necessary to evaluate his conduct in deciding a "just punishment" in this case.

### v. Jeremiah's Pro-Social Traits and Positive Conduct in Structured Environments

In reviewing the mitigation material, numerous letters from friends and family, school records, and expert reports, it is noteworthy how there is no evidence of Jeremiah being anti-social, aggressive, breaking rules, being a truant, or demonstrating deviance or violence in any manner whatsoever. Throughout his schooling, especially when he was given the opportunity to attend Waubonsie Valley High School in Aurora, Jeremiah succeeded due in large part to his own determination and the proper guidance and encouragement of his teachers. It must be emphasized how the Life Chronologies—supported by numerous witness interviews—prove that Jeremiah has always excelled when he is given structure to live within and rules to abide by.

Jeremiah struggled and failed in the absence of such structure and guidance, as with the unmonitored time online—whether it was when he was an 11-year-old exploring gay pornography and encountering older men or as a teenager on social media sexting with others. Still, Jeremiah's life experiences clearly demonstrate that when given proper instruction and structure, he can be educated and clearly responds to treatment and guidance—and in fact he seeks and desires such guidance. On that note, hundreds of pages of BOP medical records provided to the Court along with the Defense Version demonstrate Jeremiah's commitment to treatment, compliance with

33

medication, and his progress in both individual and group therapy settings. This track-record bodes extremely well for Jeremiah's prospect for compliance with treatment, therapy, and conditions of supervised release when he is released into the community.

### vi. Jeremiah's Family Ties and Strong Community Support.

Abundantly clear in the seventy-plus character reference letters submitted on Jeremiah's behalf is the immense amount of support that he has from those who truly know him and have stood by him throughout these difficult times. That support began in large part after Lizzie's death when parents of cheerleading peers stepped up to assist him. (PSR, p. 18, ¶149). During the week, Jeremiah would stay in the hotel, but he would spend the weekends with different cheerleading families. (*Id*.). As discussed above, soon the Cheer families became Jeremiah's surrogate family.

In letters and videos submitted to the Court, some of these Cheer families speak directly to Jeremiah's struggles and their ongoing support. For instance, the Whelans and the Townes, who first met Jeremiah through cheerleading, provide a glimpse of the large "extended-family" network that continues to support him, despite the seriousness of the charges. Jeremiah would end up staying with the Whelans on a full-time basis after convincing his father to let him leave the hotel, which he describes as giving him a glimpse of a "bright future" by showing "a real family atmosphere." (PSR, p. 19, ¶149); (S. Whelan Letter) ("The day his father called him to tell him to move back into the motel was an extremely hard day for us all. As we brought him back to the hotel, we told him multiple times that he was welcome to

move in with us and that he would always shave his own bedroom here. A few weeks later Jerry was able to talk his father into letting him move out of the motel and in with us. He has been ours ever since."). The sad truth is that Jeremiah's father only let his son live with the Whelans in exchange for Jeremiah's benefits associated with his mother's death.

Both the Townes and Whelans speak about Jeremiah's difficult life, his resilient character, and the optimism they have for his future notwithstanding the charges and the uncertainty of this case. They discuss how their initial feelings of anger and betrayal were overcome by their unconditional love for Jeremiah, whom they consider to be a family member. Both families attest to Jeremiah's acceptance of responsibility for his wrongdoing and realization of the harmfulness of his conduct. Jeremiah continues to communicate with the Whelans and other families on a near-daily basis. (PSR, p. 19, ¶152). The Whelans would welcome Jeremiah's return to their home, which is suitable location for him to live in upon his release. (PSR, p. 19, ¶20).[13]

This support system will be fundamental for Jeremiah's transition back into society and will help ensure that he remains engaged in necessary therapy and treatment programs. *See*, *e.g.*, (J. Houchens Letter) ("Please allow Jerry a chance to be the person I know he can be. You can be assured that when Jeremiah is released,

---

[13] Rather tragically, Jeremiah purchased a condominium in Naperville in the summer of 2020. However, due to his arrest in the case, he never had an opportunity to live in it. This condominium promised to give him his first real home of his own and stability for the future. This was even more important for Jeremiah due to his long history of housing insecurity. Now, it appears that the condominium is located in an exclusionary zone, and he will never have the chance to live there. (PSR, p. 20, ¶158).

he will have a strong and committed support network that includes my family. We are all committed to keeping him on a healthy path and to help him find a job and place in the community."); (H. Hart Letter) ("All of this love that you see is a reflection of who Jerry is as a person, not of us. We are a reflection of him. We are the lucky ones. Please don't let this mistake take my brother away from our family. Please let him finish his time somewhere safe and let him come home as quickly as possible. I promise you that when he is home he will live a moral and quiet life supported by good people."); (M. Gallagher Letter) ("As he transitions back into society, we will be there to assist him getting back on track to being the inspirational young man he is.").

### vii. Jeremiah's Strong Potential for Rehabilitation, Diagnosis of Not Suffering from a Sexual Deviance Disorder, and Low Risk for Reoffending.

Central to the overarching issue of what is "just punishment", are questions regarding the causes of Jeremiah's offense conduct, the risks of it repeating, and his potential for rehabilitation. Those questions are answered in very large part by the expert evaluations by Dr. Marilyn Hutchinson and Dr. Antoinette McGarrahan. (*See also* PSR, p. 22, ¶¶175-76). Both doctors conclude that Jeremiah does *not* suffer from pedophilia, hebephilia, paraphilia, or any other sexual deviance disorder. These expert conclusions are bolstered in that there was no evidence on Jeremiah's digital devices reflecting searches for child pornography or queries for topics related to children. (PSR, p. 9, ¶53). Moreover, due to several factors detailed in her report and

highlighted below, Dr. McGarrahan concludes that Jeremiah has a low risk of reoffending.

Dr. Hutchinson is a forensic psychologist who prepared an extensive report based on her review of case-related materials, collateral interviews, and testing of Jeremiah. Her report focuses on eight specific referral questions ranging from how to understand the offense conduct given Jeremiah's age, adolescent brain development, Cheer culture, and his sexuality, to whether Jeremiah should be considered sexually deviant and psychological treatment would benefit Jeremiah.

The extraordinarily detailed social history in Dr. Hutchinson's report highlights Jeremiah's early experiences with online pornography, which was how he first explored and learned about his own sexuality. Bear in mind that Lizzie Bowman's Christian beliefs precluded her from even acknowledging Jeremiah's sexual orientation, let alone discussing these matters with him or, more importantly, supporting him. His father never spoke to him at all. During that same period of discovery, Jeremiah's unmonitored time online also introduced him to older males, who in turn skewed Jeremiah's understanding of what a "normal" romantic relationship looked like. This distorted perception later manifested in real life when Jeremiah was 13, and a 19-year-old member of the Cheer community sexually assaulted him.

Dr. Hutchinson opines that Jeremiah suffers from Major Depressive Disorder and Post Traumatic Stress Disorder. Self-reporting and BOP medical records corroborate his depression, which he describes as "always somewhat present." (PSR,

p. 21, ¶166). Dr. Hutchinson also notes a history of traumatic events related to physical and sexual abuse, and how Jeremiah "tries to avoid situational reminders, but is not always successful." Dr. Hutchinson further observes that he has likely developed tools that help avoid and handle complex feelings described as "serial addictive behaviors" including "eating, overworking, and sex." Notably, the PSR reflects how Jeremiah's consumption of online pornography decreased as he grew older and attended college. (PSR, p. 22, ¶183).

Directly relevant to the core questions before the Court are Dr. Hutchinson's answers to the referral question as to whether Jeremiah is "sexually deviant and attracted to children." Her answer is that Jeremiah "is not sexually attracted to children." She observes that "Jeremiah requested nude pictures from younger boys he knew when he was initially coming out and exploring his sexuality because they were his friends." Dr. Hutchinson's report concludes that Jeremiah would benefit and is psychologically amenable to rehabilitation, and that he is in fact personally motivated to continue needed therapy.

Dr. McGarrahan is a forensic psychologist and neuropsychologist who prepared an executive summary outlining her findings regarding Jeremiah's risk to engage in non-contact and contact sexual recidivism. Prior to preparing her summary, Dr. McGarrahan interviewed and examined Jeremiah. She also reviewed case-related materials, supplemental items collected by the defense team, and the raw psychological test data from Dr. Marilyn Hutchinson's psychological examination of Jeremiah. Dr. McGarrahan conducted four separate risk assessments, including

the Scoring of the Prisoner Assessment Tool Targeting Estimated Risks and Needs (PATTERN) used by the Bureau of Prisons.

Dr. McGarrahan's professional opinion is that Jeremiah "is at low risk to engage in non-contact and contact sexual recidivism." Notably, Dr. McGarrahan found that Jeremiah "does not meet diagnostic criteria for any paraphilia (sexual deviance disorder), including pedophilia and hebephilia." Dr. McGarrahan believes that Jeremiah would benefit from individual and group psychotherapy in addition to other risk management programs or conditions mandated by the court. Jeremiah is highly motivated to participate in this treatment and these recommendations would further reduce his risk for sexual recidivism. Indeed, Jeremiah has in fact benefited from the psychological treatment that he has obtained at the MCC. He explains that this treatment has helped, and that he no longer feels alone because he is able to discuss his struggles with others. (PSR, p. 21, ¶171).

### d. A 72-Month Sentence Will be Sufficient to Comply with the Factors Set Forth in § 3553(a)(2).

After considering the nature and circumstances of the offense and the history and characteristics of a defendant, the Court is charged with fashioning a sentence that is sufficient, but not greater than necessary—taking into account the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; to afford adequate deterrence (general deterrence) and protect the public from further crimes of defendant (specific deterrence); and to provide the defendant with needed educational or vocational

training, medical care, or correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D).

### i. The Need to Reflect the Seriousness of The Offense and Promote Respect for The Law, § 3553(a)(2)(A).

Jeremiah recognizes the seriousness of his offenses, as discussed above in the context of the nature and circumstances of the offense. Yet, a sentence of 72 months for a first-time offender with no criminal history sends an undeniably strong message. That message is reinforced by any term of supervised release imposed as well as the mandatory sex offender registration, which is perhaps the strongest stigma of any criminal conviction. *See R.V.*, 157 F. Supp. 3d at 248 ("Reconnecting with family and loved ones may be particularly hard for convicted sex offenders, because of the stigma associated with the offense as well as the strict restrictions imposed upon release.").

Indeed, these strict post-release conditions will impose severe restrictions on Jeremiah's liberty and will also prevent him from enjoying basic freedoms. *Schepers v. Commissioner*, 691 F.3d 909, 914 (7th Cir. 2012) (discussing restrictions on liberties of sex offenders). *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (affirming district court's 30-month sentence for traveling with intent to engage in sex with a minor based in part on court considering the "lasting effects of being required to register as a sex offender"). The conditions—and the constant threat of revoking supervised release or prosecution for SORNA violation—create strong disincentives that question the need for a lengthy period of incarceration.

While harsh prison sentences for child pornography abound in this district and others, there is no shortage of sentences of no or minimal incarceration deemed

reasonable by circuit courts. *See*, *e.g.*, *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) (affirming sentence of five years of probation); *United States v. Stall*, 581 F.3d 276 (6th Cir. 2009) (affirming sentence of one day incarceration followed by 10 years of supervised release); *United States v. Prisel*, 316 Fed.Appx. 377 (6th Cir. 2008) (affirming sentence of one day in prison followed by 18 months of home confinement after guilty plea for possession of child pornography); *United States v. Rowan*, 530 F.3d 379 (5th Cir. 2008) (affirming sentence of five years of probation when guidelines range was 46-57 months); *Polito*, 215 Fed.Appx. 354 (affirming sentence of five years of probation and one year of house arrest); *United States v. Meillier*, 650 F. Supp. 2d 887, 888 (D. Minn. 2009) (sentence of one day in prison and 30 years' supervised release for possession of child pornography); *United States v. Crespo-Rios*, No. 08-208 (JAG), 2015 U.S. Dist. LEXIS 144498, at *1 (Case No. 08-208, D.P.R. Oct. 19, 2015) (sentence of time-served and 15 years of supervised release for convictions of possession of child pornography and transferring obscene material to a minor that resulted in guidelines range of 70 to 87 months). Given the numerous low and even non-custodial sentences, exemplified by the cases cited above, there are ample reasons to question the utility of a custodial period greater than 72 months even considering the seriousness of the offense.

### ii. The Need to Provide Adequate Deterrence and to Protect The Public from Further Crimes, § 3553(a)(2)(B)-(C).

Regarding deterrence, counsel recognizes the importance of general deterrence. The government often speaks of messages being sent by the community. That argument of course assumes that the "community" of sexting, developmentally stunted, and sexually traumatized gay adolescents will somehow learn of this sentence, appreciate it, and be affected by it. It must also be noted that research has shown that "increases in the *certainty* of punishment, as opposed to the *severity* of punishment, are more likely to produce deterrent benefits." Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, p. 1, The Sentencing Project, Nov. 2010.[14]

Ultimately, it is difficult, if not impossible to quantify how much general deterrence is achieved by a specific sentence. In any event, if there is a deterrent message to be sent, it has been conveyed in Jeremiah's arrest, indictment, prosecution, pretrial detention, guilty plea, at least five-years he will have to serve in prison, the strict conditions of supervised release, and his lifetime sex offender registration. *See, Garate*, 543 F.3d at 1028 (affirming below-guideline sentence and citing, among other things, the "lasting effects of being required to register as a sex offender."). To put it bluntly, if the foregoing fails to provide adequate general deterrence, nothing will.

---

[14] Available at, https://bit.ly/39roMae (emphasis in original) (last visited June 15, 2022).

Further, supervised release with strict conditions as well as sex offender registration requirements will reduce the risk of recidivism. As a registered sex offender, Jeremiah knows that his status as a sex offender will be publicly visible. His conditions of supervised release will strictly curb his use of the Internet and will preclude his presence in certain locations and around certain people. Both the conditions of supervised release and SORNA are punitive aspects that Jeremiah will endure long after his sentence of imprisonment concludes.

A sentence of 72 months, coupled with the foregoing collateral consequences will undoubtedly send an extremely strong warning to others about this offense. This is particularly true in this case due to Jeremiah's lack of criminal history and his ongoing mental health issues, which have made his custodial experience far more miserable than for the average inmate.

In addition to these restraints on Jeremiah's liberty that will serve specific deterrence, Jeremiah's risk of recidivism is statistically low. *See United States v. Cabrera*, 567 F.Supp.2d 271, 279 (D. Mass. 2008) (Gertner, J.) (imposing below-guideline sentence in part on the defendant's status as a first offender and citing Commission's May 2004 "First Offender" report to observe that defendants "with zero criminal history points are less likely to recidivate than all other offenders."). Indeed, jail time has already had a disproportionally severe impact on Jeremiah as he is a first-time offender. *See, e.g., United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming below-guideline sentence for first-time offender because a prison term would mean more to him "than to a defendant who previously been imprisoned");

*United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wisc. 2006) (below guideline sentence is appropriate because defendant had never been confined before and sentence was sufficient to "to impress upon him the seriousness of the offense and to deter others under similar circumstances."); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

It also worth noting that Jeremiah spent the entirety of the global pandemic in pretrial detention when inmate isolation, service interruptions, and physical restraint were at unprecedented highs. Programs have not been readily available, and detainees have just recently been permitted on the Metropolitan Correctional Center in Chicago ("MCC") rooftop for exercise and to simply take a breath of fresh air. Jeremiah's time in custody has indisputably been "harder time" than that served by those detained at the MCC pre-pandemic. *See, e.g.*, *United States v. Pressley*, 345 F.3d 1205, 1219 (11th Cir. 2003) (conditions of confinement, including 23-hour-a-day lockdowns with no outside access permitted a downward departure); *accord United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (holding that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures.")

44

### iii. The Purposes Behind § 3553(a)(2)(D), Specifically Providing Effective Medical Treatment, Will Be Met Through Treatment Programs on Supervised Release, and Would be Impaired by a Longer Than Necessary Term of Custody.

In fashioning a sentence, the Court must consider how to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in *the most effective manner*." 18 U.S.C. § 3553(a)(2)(D) (emphasis added). Probation has recommended that Jeremiah participate in a sex offender treatment program. (Special Condition No. 9). It is not necessary that the treatment occur within the BOP. Indeed, due to Jeremiah's mental health issues, counsel submits that this treatment would be more effective outside of prison walls, so that Jeremiah could ideally obtain treatment and therapy from specialized medical providers.

As the record already demonstrates, imprisonment beyond 72 months would not help Jeremiah receive medical treatment "in the most effective manner." *See United States v. Pineyro*, 372 F. Supp. 2d 133, 138-40 (D. Mass 2005) (imposing time-served sentence of 15 months when range was 46-57 months in part because BOP could not offer medical treatment plan comparable to what the defendant received and concluding "only a non-jail disposition would be consistent with the rationale of the various departure provisions in the Guidelines and the underlying statute); *United States v. McFarlin*, 535 F.3d 808, 812 (8th Cir. 2008) (affirming sentence of probation in drug conspiracy case when guidelines were 60 months based on findings

of the defendant's medical conditions and inability to receive effective medical care in prison).

### iv. A 72-Month Sentence Will Help Minimize the Risk of Abuse to Jeremiah in a Custodial Setting.

Jeremiah is vulnerable to abuse in prison due to the nature of the charges and the publicity the case has garnered. Courts have recognized that "a defendant's unusual susceptibility to abuse by other inmates while in prison may warrant a downward departure." *United States v. Parish*, 308 F.3d 1025, 1031 (9th Cir. 2002) (citing *Koon*, 518 U.S. at 111-12; *United States v. Lara*, 905 F.2d 599, 603 (2d Cir. 1990) (affirming below guideline sentence for defendant based on his diminutive in size, bisexuality, and immaturity); *United States v. LaVallee*, 439 F.3d 670 (10th Cir. 2006) (affirming downward departure based on the defendant's vulnerability in prison due to his former status as prison guard and publicity of case).

The BOP has identified several factors that render inmates particularly vulnerable to abuse in prison. Those factors include "being perceived as gay, having been a victim of sexual abuse in the past, suffering from mental illness, and being a known sex offender, particularly against children. …. An individual with *any one* of these characteristics is considered especially vulnerable to physical or sexual assault while incarcerated." *United States v. D.W.*, 198 F. Supp. 3d 18, 66 (E.D.N.Y. 2016) (emphasis in original, citation omitted). Jeremiah meets all of these criteria; thus he will spend his years trying to avoid being prey for other inmates and regrettably, staff. *See D.W.*, 198 F. Supp. 3d at 73 (quoting Alice Ristroph, *Sexual Punishments*, 15 Colum. J. Gender & L. 139, 159-60 (2006) (" '[S]ex offenders are a distinct and

46

disfavored category within prison populations, subject to heightened abuse from both corrections officers and fellow inmates. By many reports, sex offenders are themselves disproportionately likely to be the target of sexual assault in prison.'").

### e. A 72-Month Sentence Will Avoid Unwarranted Sentencing Disparities—§ 3553(a)(6).

Pursuant to 18 U.S.C. § 3553(a)(6), the Court is to also consider the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Due to the inherently flawed non-production child pornography guidelines that fail to distinguish between the most serious and mine run offenses, as well as the numerous cases that have imposed below-guideline sentences, a guideline sentence could result in unwarranted disparities. *See United States v. Darby*, 2017 U.S. Dist. LEXIS 44558, at *8 (Case No. 2:16CR36, E.D. Va. Mar. 27, 2017) (noting, "In many cases, courts must be careful to ensure that a downward departure of variance does not result in an unwarranted sentence disparity. Paradoxically, in child pornography cases, it would be a guideline sentence that should cause worries about unwarranted sentence disparities.").

The district court in *Crespo-Rios* arrived at a similar conclusion when, after citing numerous circuit and district-level cases resulting in below-guideline sentences, including non-custodial sentences, it observed: "[t]hese cases undoubtedly reflect the trend described above that courts do not sentence within the Guidelines recommended range when such range 'fails to distinguish adequately among offenders based on their levels of culpability and dangerousness, and is overly severe.'" *Crespo-Rios*, 2015 U.S. Dist. LEXIS 144498, at *16 (citation omitted).

47

IV.     **CONCLUSION**

For the foregoing reasons, counsel respectfully requests a sentence of 72 months to be followed by 8 years of supervised release.

Respectfully submitted,

/s/ Todd S. Pugh
**TODD S. PUGH**


/s/ Joshua G. Herman
**JOSHUA G. HERMAN**

**BREEN & PUGH**
53 W. Jackson Blvd., Suite 1215
Chicago, Illinois 60604
(312) 360-1001 (t)
(312) 362-9907 (f)
tpugh@breenpughlaw.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 404
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com

## <u>CERTIFICATE OF SERVICE</u>

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing pleading was served on June 22, 2022, in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P.5., LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.


/s/ Joshua G. Herman
**JOSHUA G. HERMAN**



**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 404
Chicago, IL 60604
(312) 909-0434 (t)
jherman@joshhermanlaw.com